# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1832

_____

United States of America,                    *
                                             *
    Plaintiff - Appellee,              *
                                             *  Appeal from the United States
v.                                           *  District Court for the Eastern
                                             *  District of Arkansas.
Jim Guy Tucker,                              *
                                             *
    Defendant - Appellant.             *

_____

Submitted:  September 13, 1999

Filed:  February 27, 2001

_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Jim Guy Tucker appeals from an order of the district court[1] on remand from our earlier decision in United States v. Tucker, 137 F.3d 1016 (8th Cir. 1998). In that case, we ordered an evidentiary hearing on allegations that juror Renee Johnson had concealed material information during voir dire and had engaged in improper

_____

[1]The Honorable George Howard, Jr., United States District Judge for the Western District of Arkansas.

communications during trial. The district court held the required hearing and found that Johnson was not dishonest in her answers to voir dire questions concerning her familial relationships and possible bias against Tucker. United States v. Tucker, 36 F. Supp. 2d 1110, 1115 (E.D. Ark. 1999). On the improper communications issue, the court found that there was no evidence that Johnson was subjected to outside influence during trial. Id. at 1117-18. Accordingly, the district court denied Tucker's motion for a new trial. Tucker argues that the district court's findings are erroneous because Johnson's explanation of why she did not reveal her relationship with her soon-to-be husband contradicts her other testimony; because the district court believed bias could only be proved by the juror's admission; and because two witnesses testified that Johnson had talked to her husband about Tucker's case during the trial. While the facts of this case are unusual and of understandable concern to Tucker, we hold that the district court's findings are not clearly erroneous, and therefore we must affirm.

When this case was tried, Jim Guy Tucker was the governor of Arkansas. After he was convicted for conspiracy and mail fraud, Tucker learned that during the trial one of the jurors, Renee Johnson, had married Charles Hayes. Hayes is a former state prisoner whom Tucker had denied clemency, both directly and by blocking an acting governor's attempt to commute his sentence. Hayes is also the nephew of a political activist, Say McIntosh, who had attacked Tucker in leaflets and demonstrated against him outside the courthouse during trial. Tucker moved for a new trial based on his allegations that Johnson had concealed her relationship with Hayes at voir dire, that she had concealed bias against Tucker, and that she had engaged in improper discussions with Hayes during trial. Tucker, 137 F.3d at 1023. Tucker supported the factual allegations of his motion with an affidavit from William L. Walker, Jr., who said he had asked Tucker to grant Hayes clemency and who recounted the circumstances under which an acting governor's attempt to grant clemency was blocked. Walker's affidavit also stated that Hayes had expressed anger over the denial of clemency. Walker claimed to have knowledge from Hayes's cousin, Tommy McIntosh, that Hayes had

discussed the trial with juror Johnson during the trial.  Id. at 1023-24.  Tucker also filed his own affidavit describing his role in denying Hayes clemency.  Id. at 1024.

In a jury questionnaire submitted about two weeks before voir dire, Johnson stated that she was single, that questions concerning a spouse were not applicable, and that she had a three-month-old child.  Id. at 1021.  In response to a question asking whether "any member[s] of your family [have] ever been charged with a crime," "what . . . charge," and "how did the case end?" Johnson wrote, "Yes. Drug Conviction. Guilty (serving 4 years)."  During the voir dire itself, held on March 4-7, 1996, Johnson stated that she had not formed an opinion regarding the guilt or innocence of any of the defendants.  Id. at 1021-22.  The judge repeatedly stressed the need for venire members to reveal possible sources of bias and gave the venire members multiple opportunities to disclose anything that could have any bearing on their partiality.  Id. at 1022.  When asked directly, Johnson said there was nothing that would affect her ability to serve fairly and impartially in the case.  Id.  Trial began on March 11, 1996, and on the fourth day of trial, Johnson married Charles Hayes over the lunch break.  Id. at 1023 n.4, 1025.

The district court conducted a hearing on Tucker's new trial motion, but even though Tucker alleged both concealment of facts at voir dire and outside influence over a juror, the court announced that the scope of the hearing would be limited to the question of whether the jury had been exposed to extraneous evidence during deliberations.  Id. at 1024.  At the hearing, Johnson testified that she did not know at the time she served as a juror that her husband had ever applied for clemency and consequently she did not know that Tucker had denied him clemency.  Id. at 1024.  She testified that she had been engaged to marry Hayes since 1994 and that she had lived with him, but counsel was not permitted to ask for further details or to explore her knowledge about Say McIntosh.  Id. at 1024-25.  Johnson stated that she did not tell about her husband's conviction when she filled out her jury questionnaire.  Id. at 1025. (Her answer to the question about family members charged with crimes referred to her

-3-

sister's husband, who, it turns out, is also Charles Hayes's brother.) The court did not allow Tucker to question Johnson about whether she considered herself part of a family with Hayes and her daughter at the time of the voir dire. See 137 F.3d at 1025. Tucker was not allowed to examine Hayes. Id. at 1027. The government called the other jurors and asked them whether there had been discussion of Hayes's clemency proceedings during the trial or deliberations. All answered no. Id. at 1025.

Although the scope of the hearing was narrowly circumscribed, Tucker made an extensive proffer. He offered to prove that he had denied Hayes's clemency request. On another occasion when Governor Tucker was out of the state, Acting Governor Jerry Jewell had tried to grant Hayes clemency, but Tucker's staff had frustrated Jewell's attempt by refusing access to Hayes's file. Id. at 1025. Hayes's cousin, Tommy McIntosh, was convicted in connection with the same crime as Hayes, and Jerry Jewell successfully commuted Tommy McIntosh's sentence. Tucker offered to prove that the Hayes-McIntosh family knew that his staff prevented Jewell from granting Hayes clemency and that Hayes had expressed anger over the denial of clemency. Tucker's proffer also detailed the anti-Tucker activities of Say McIntosh, Tommy McIntosh's father, including his distribution of fliers accusing Tucker of racism in denying clemency to a black prisoner and juxtaposing the prisoner's supposed innocence with Tucker's supposed guilt. Tucker offered to prove that McIntosh demonstrated in front of the courthouse during Tucker's trial. The court denied Tucker's new trial motion because the court was not persuaded that the jury had access to extraneous evidence during deliberations. Id. at 1026.

On appeal, we concluded that Tucker was entitled to a fuller hearing than he had received. Tucker's claim of concealed juror bias was based on McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984), which required him to prove three things about the voir dire: (1) that Johnson had answered voir dire questions dishonestly; (2) that she was motivated by partiality; and (3) that the true facts, if known, would have supported striking her for cause. Tucker alleged that Johnson

-4-

deceived the court by not including information about Hayes when she answered the question about whether a member of her family had been charged with a crime.  He also alleged that Johnson had dishonestly concealed her relationship to an anti-Tucker activist and her marriage to someone who had a grudge against Tucker, even though the court repeatedly urged the venire members to come forward with such information.  The district court foreclosed Tucker from presenting evidence on his McDonough allegations at the 1996 hearing and focused only on the allegations that extraneous evidence had come before the jury.

Despite the narrow parameters of the 1996 hearing, Tucker had adduced evidence raising substantial questions about whether Johnson had tried at voir dire to conceal her relation to Hayes.

> According to Tucker's proffer, Johnson lived with Hayes, had a child with him, and was only a few days away from marrying him at the time of voir dire.  Whether a juror in such a position would either understand Hayes to be included in the term "family" or at least would understand that the questionnaire meant to ask about people with whom she shared such a close relationship, is, we believe, an issue that requires further detailed inquiry.

Id. at 1028.  Tucker had also raised fact questions about whether Johnson harbored bias against Tucker that she should have revealed during voir dire.  His proffer of evidence suggested Johnson might have known about her husband's clemency proceedings and have been prejudiced against Tucker because of his role in denying Hayes clemency.

We held that Tucker had "raised enough question about what Johnson knew at the time of voir dire to entitle him to a full hearing on [the McDonough] issue, including crucial credibility determinations."  Id. at 1027.  We remanded with instructions that Tucker be allowed to adduce evidence relevant to the key questions of whether

-5-

Johnson concealed her relation with Hayes and the story of his clemency petition; whether Johnson concealed these circumstances out of partiality; and whether there were grounds to strike Johnson for cause. Id. at 1029.

We also held that Tucker's allegations of improper communications between Hayes and Johnson during the trial suggested the sort of "private communication, contact, or tampering," which gave rise to a presumption of prejudice in Remmer v. United States, 347 U.S. 227 (1954). 137 F.3d at 1030. Tucker had presented the affidavit of William Walker saying that Walker had knowledge that Hayes and Johnson had talked about the case. We said:

> The allegations of ex parte contact must be viewed in light of the extraordinary saga of Hayes's attempts to gain clemency; Tucker's frustration of those attempts directly and then by hiding Hayes's file from Jewell; and the McIntosh family's campaign against Tucker. With these facts in the background, the assertion that Johnson and Hayes had discussed the case during the trial must be taken as an allegation of serious misconduct, with a significant potential for prejudice to Tucker.

Id. at 1031. Such allegations entitled Tucker to a hearing to determine whether outside influence affected Johnson's ability to serve impartially on Tucker's jury. Id. at 1033. However, the court had limited the scope of the 1996 hearing to investigation of whether the jury as a whole had been exposed to extraneous evidence, which was not the nature of Tucker's contention. Therefore, we remanded for the district court to conduct a hearing that would address Tucker's actual claim, probing whether Hayes and Johnson had talked about the case, what was said, and what effect such communications had on Johnson. Id. at 1033.

On remand, the district court conducted a three-day hearing in which Renee Johnson Hayes, Charles Hayes, William Walker, Tommy McIntosh, Tucker and others testified.

-6-

Johnson testified that she became involved with Hayes about six months or a year after he was released from prison, that she had lived with him about a year and a half before January 1996, and that at the time of voir dire she lived with him and their daughter "as a family." By February 1996, she said, they were contemplating getting married. She had bought a wedding ring and had looked into reserving a bed and breakfast for a wedding or wedding reception. She said that the reason she did not identify Hayes as a family member on her juror questionnaire was that she was not married to Hayes when she filled it out (in February 1996) and she did not believe the questionnaire asked anything that called for her to identify him. She later agreed with Tucker's lawyer that she and Hayes "bought a house as a family," "lived in it as a family," "paid utility bills as a family," and "paid the mortgage as a family." However, she also answered yes to the special prosecutor's leading question asking whether it took a marriage to make a family, and she agreed with another leading question that this was why she had not identified Hayes on the questionnaire.

Johnson said she had "known of" Hayes all her life, but she had not become personally involved with him, in the sense of being engaged, until 1993 or 1994. She said she had known of him when he was in jail, because his brother was married to her sister at the time. However, Johnson denied that she ever talked to Hayes about the circumstances surrounding his attempts to get out of prison.

Johnson said that Tommy McIntosh had visited Hayes at their house once or twice in the six months before the Tucker trial. McIntosh would visit with Hayes outside the house while she was inside. Johnson's only contact with Tommy McIntosh would have been to exchange pleasantries with him, and she explicitly denied that he ever expressed to her any hostility toward Tucker.

Johnson said that during the trial she did not discuss what went on in the courtroom with anyone and that no one tried to influence her thoughts about the trial.

Hayes also took the stand. He testified that before he and Johnson were married on March 14, 1996, they had been engaged a year and a half. He said she had wanted to get married "several times before then," but that he was "holding out."

Hayes said he first learned from Tommy McIntosh before Tucker's trial that Hayes's file had been intentionally concealed from Jerry Jewell, but that he did not associate the incident in any way with Tucker. He said he was not even aware that it was Tucker who had denied his request for clemency. He said he had not placed much hope in the idea that he would receive clemency but instead had concentrated on getting relief from the federal court (which in fact granted his habeas corpus petition). Hayes said that he and Johnson "really didn't get into" discussing his conviction. Hayes said, to his knowledge, Johnson never broke her word as a juror not to discuss the trial. He also said he never told Tommy McIntosh or William Walker that he and Johnson had discussed the trial while it was going on.

Tommy McIntosh testified that he had dated Johnson a couple of times after he got out of jail and that she knew his father, Say McIntosh, at that time. He found out through family members that Johnson was on the Tucker jury. Tommy testified that he and Hayes talked about the Tucker case and that Tommy expressed his opinion to Hayes that Tucker was going to be convicted. However, Tommy said, he never talked to Johnson about the trial, nor did he do anything to encourage Hayes to influence her. Tommy said he did not know about Tucker's staff hiding files from Jewell until after Tucker was convicted. He did not recall that Hayes ever said he discussed the case with Johnson during trial, but Tommy believed they did discuss it because, "[I]t's obvious. People on juries talk to their husbands." Tommy characterized his relation to Hayes as "best buddies, best cousins" and said that they were "like brothers." He said he wanted Tucker to be convicted so Tucker would "see what it felt like to be convicted on something you think you didn't do." Tommy telephoned William Walker during the trial. Knowing that Walker was a Tucker ally, Tommy said something like,

"Yeah, your boy going to jail. We got him. He's going to be convicted." He said he may have bragged to Walker about Johnson being on the jury.

William Walker stated that after Jewell had failed in his attempt to commute Hayes's sentence, Walker contacted Hayes and explained to him that Hayes's file had not been made available so that Jewell could act on it. Walker said that Hayes's disappointment and anger were apparent. Walker testified that Tommy McIntosh called him late one night during trial and told him, "We've got somebody on the jury." Walker didn't know at the time what Tommy was talking about, but when he found out after the trial that Hayes's wife had been on the jury, he concluded that Tommy had been talking about Hayes's wife. He called Hayes, who confirmed that his wife was on the jury. Walker asked Hayes whether he and his wife had any conversation about the trial, and Hayes responded, "Sure, that's my wife. We sleep together every night." On cross examination about this conversation, Walker was unsure whether Hayes had said he talked to his wife about the trial <u>during trial</u>: "I don't know whether he said 'during the trial.' I think at that point, I think he may have, he may not have." Furthermore, though he thought Hayes said that he talked with Johnson about "the trial," he had not asked Hayes for any further detail about what was said. Walker admitted that he was a Tucker political ally, that he had done approximately $13,000 worth of consulting work for Tucker some twenty years before, and that he had received a political campaign contribution from him and from a company in which Tucker held an interest.

Tucker himself testified about the Hayes-McIntosh clemency proceedings and about Say McIntosh's anti-Tucker campaigns. Tucker said that Say McIntosh turned against him after the denial of clemency to Charles Hayes. Tucker identified McIntosh fliers calling Tucker a liar, murderer, and thief, saying Tucker had a witness killed, and alleging that Tucker had stolen "all that good money that was meant for blacks to go into business for themselves."

There was also evidence about the timing of Johnson's arrangements at the Hotze House, the bed and breakfast where Johnson and Hayes had a reception after their marriage. Johnson had made arrangements in January 1996 with the Hotze House for a wedding and reception on March 9, 1996, but during the trial she changed the reservation to March 29, which was when the reception actually occurred (after the March 14 wedding).

After the 1998 hearing, the district court found that Johnson was not dishonest in failing to identify Hayes in response to the question about family members charged with crime:

> Johnson did not believe that living as a "family" constituted a family. As Johnson stated, it takes a marriage to make a family. Johnson testified credibly, in the Court's opinion, that Question 39 concerned only family members and that Charles Hayes did not fall into that category because they were not married.

36 F. Supp. 2d at 1115. The court also found that "Johnson was not being dishonest or intentionally deceiving the litigants or the Court when she did not respond to the Court's requests that the jurors disclose anything that could have any bearing on their partiality." Id. Furthermore, the court found that Tucker had failed to show Johnson had actual bias against him. Id. at 1116. The court found that there was no evidence that Johnson harbored negative feelings toward Tucker, and Hayes testified that he harbored none. Id. at 1115-16. Even assuming that Hayes did have a grudge against Tucker, the court found there was no evidence that he conveyed those feelings to Johnson. Id. at 1116. The court rejected Tucker's legal argument that the facts gave rise to implied bias, whether or not Johnson was actually biased against Tucker; the court held that implied or presumed bias was not a legal basis for relief. Id. at 1116. Having found no dishonesty and no actual bias, the court rejected Tucker's McDonough claim. Id. at 1115-17.

The court rejected the claim of improper communication with a juror because there was no evidence that any such communication occurred. Though Walker had signed an affidavit saying that Hayes and Johnson had discussed the trial "during the trial," Walker's testimony at the hearing negated the crucial time allegation: "At the hearing, Walker could not recall whether Hayes said that the communications occurred during the trial." Id. at 1117. Walker's testimony also fell short of establishing that there had been communication of an improper nature: "Furthermore, Walker admitted that he did not know the content of any conversations between Hayes and Johnson and Hayes did not tell Walker that he had said anything improper to his wife during the trial." Id. Moreover, there was evidence that Johnson had not been subjected to any improper influence: "Johnson testified credibly, in the Court's opinion, that she did not have any conversations with Hayes, or any McIntosh family member, about the trial during the trial. The Court is persuaded that Johnson heeded the Court's regular admonition not to discuss the case with anyone." Id. at 1117-18.

I.

Tucker argues that the district court erred in rejecting his McDonough claim because the court's decision was based on erroneous findings of fact and because the court mistakenly thought it could only find bias if Johnson admitted bias against Tucker.

Findings of fact on a McDonough hearing are reviewed under the "clearly erroneous" standard of review. See United States v. Rouse, 111 F.3d 561, 573 (8th Cir. 1997). Honesty of the juror and actual bias are factual issues. See id.; Mack v. Caspari, 92 F.3d 637, 642 (8th Cir. 1996) (juror bias). The ultimate determination of whether a new trial is required is reviewed for abuse of discretion. United States v. Williams, 77 F.3d 1098, 1100 (8th Cir. 1996).

The Supreme Court discussed the meaning of the "clear error" standard of review in <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564 (1985), our pole star on this question. Under <u>Anderson</u>, review for clear error requires not just deference to the fact finder's views, but a very specific level of deference:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

<u>Id.</u> at 573-74. We may reject the fact finder's choice between conflicting evidence only where there is something wrong with the choice. <u>See</u> <u>id.</u> at 574-75. Furthermore, when findings are based on determinations regarding the credibility of witnesses, the level of deference is even higher than the standard already described. <u>Id.</u> at 575. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." <u>Id.</u> This reasoning, though it certainly counsels a high level of deference, suggests three specific ways in which a finding based on credibility could be erroneous. First, the accepted testimony could be incoherent or facially implausible. <u>See</u> <u>Taylor v. Howe</u>, 225 F.3d 993, 1004, 1006, 1008 (8th Cir. 2000) (finding of no discrimination clearly erroneous in relying on testimony that was implausible). Second, the testimony could be contradicted by extrinsic evidence. Third, the finding itself could be internally inconsistent.

Tucker's attack on the district court's findings is primarily an attack on the district court's judgment that Johnson was credible. Therefore, the level of deference owed to the district court's findings is particularly high. However, Tucker argues that Johnson's

testimony is self-contradictory and too implausible to be credited and that some of her testimony is contradicted by extrinsic evidence.

Tucker argues that Johnson minimized the extent of her relationship with Hayes in order to defend her failure to identify him in response to the question about family members charged with crime. First, Tucker contends that Johnson's testimony about the status of her wedding plans at the time of voir dire was contrary to fact. In the 1996 hearing, she said that she and Hayes became engaged in 1994 but had never set a date for their wedding. Tucker put on evidence in the 1998 hearing that Johnson had made a reservation at the Hotze House in January 1996 for a March 9 wedding and reception. Johnson also admitted that at the time of voir dire, she had bought a ring for the wedding. However, the Hotze House reservation lapsed in February, for nonpayment of the deposit, and was eventually rescheduled as a reception for March 29. The district court found that Johnson's plans for marriage "were not definite." 36 F. Supp. 2d at 1115. This finding is supported by Hayes's testimony Johnson had wanted to get married "several times" before they finally did so, but that he was "holding out." The extrinsic evidence does not so contradict Johnson's statements that the district court was obliged to find Johnson had been dishonest.

Even assuming Johnson's testimony about the status of her wedding plans was disingenuous, the whole question about the wedding plans is really subsidiary to the question of whether she was "virtually married" or part of a "family" with Hayes at the time of voir dire so that she knew her failure to identify him was misleading. On this question, the court considered Tucker's evidence that Johnson and Hayes lived together as a family, that they had a daughter together, and that they had bought a house together. 36 F. Supp. 2d at 1115. Tucker points out on appeal that Johnson agreed that at the time of voir dire she and Hayes were living in their home "as a family," they bought the house "as a family," and paid their bills "as a family." Despite this evidence, the court concluded that Johnson had satisfactorily explained her failure to include Hayes in her response to the question about family: "Johnson did not believe that living

as a 'family' constituted a family. As Johnson stated, it takes a marriage to make a family. Johnson testified credibly, in the Court's opinion, that Question 39 concerned only family members and that Charles Hayes did not fall into that category because they were not married." Id. Again, Johnson's reconciliation of her various statements is not so implausible that the district court was obliged to find she was dishonest.

Tucker also attacks the district court's finding that "Johnson was not being dishonest or intentionally deceiving the litigants or the Court when she did not respond to the Court's requests that the jurors disclose anything that could have any bearing on their partiality." Id. First, Tucker points out that Johnson had testified at the 1996 hearing that she did not know Hayes when he was in jail. At the 1998 hearing, Tucker's counsel introduced Johnson's testimony from her 1998 divorce proceedings in which she said she had known Hayes all her life. Moreover, Hayes testified that he met Johnson when she came with her sister to visit his brother and him in prison. The district court concluded that these contradictions did not show that Johnson was lying, but rather that she was using the word "know" in two different senses: "She 'knew of Hayes' but did not know him, in the sense of being friends or having conversations, until after he was released from prison. Her distinction is rational, not farfetched." 36 F. Supp. 2d at 1116. Neither Johnson's reasoning, nor the court's acceptance of it, is too implausible to support a finding that Johnson honestly believed she had no facts in her background of the sort the court was asking her to reveal.

Tucker points out that Johnson testified in the 1996 hearing that she "knew of" Say McIntosh, but did not "know" him. At the 1998 hearing, Tommy McIntosh testified that Johnson knew Say McIntosh when Tommy was dating her, before her marriage. Tommy did not say how well Johnson knew his father, and so his testimony is not necessarily at odds with hers. And, more to the point, Johnson said that she was not interested in Say McIntosh's political activities, testimony which the district court believed based on demeanor and context. See 36 F. Supp. 2d at 1117.

Tucker also infers dishonesty from Johnson's testimony at the 1996 hearing that she could not say whether Hayes was still in touch with Tommy McIntosh. At the 1998 hearing, Johnson seemingly acceded to the statement that Tommy McIntosh and her husband were in "constant contact." However, this testimony must be considered in light of the fact that Tommy McIntosh was living in Nashville, not Little Rock, during the trial. When questioned more specifically about contact between Tommy and Hayes, Johnson said Tommy had been to her house to see Charles probably once or twice before the trial. Neither Hayes nor Tommy told of any more extensive contacts between the two men, and both indicated that Johnson was inside while they visited outside the house. This evidence does not compel a finding that Johnson was dishonest.

Tucker also attacks the district court's finding that Johnson was not well informed on political matters, see id. at 1117, which he points out is in some tension with her statement that she was well informed on local news events. Johnson said that she did not read the newspapers every day, and she watched the news "occasionally." She said she had not been politically active in 1996 or before. Even if there is a discrepancy between the testimony and finding, it is necessarily minor and tangential, because the primary questions were what Johnson knew about her husband's dealings with Tucker and whether, with such knowledge as she had, she was obliged to inform the court about those dealings. Her direct testimony on this issue was that she had no knowledge whatsoever of the circumstances under which Hayes regained his freedom and she never became aware of her husband's request for clemency until Tucker's new trial motion was filed. Her general interest in the news is not particularly relevant in assessing her relation with Say McIntosh, because she testified she was aware of his political activities, but not interested in them.

In sum, under the rigorous standard of Anderson v. City of Bessemer City for review of findings of fact, we must affirm the district court's finding that Johnson's

answers at voir dire were honest. Thus, Tucker's <u>McDonough</u> claim fails at the first step.

Tucker argues on this appeal that he could be entitled to a new trial without a finding of juror dishonesty, by simply proving bias. To divine the law on this question in our circuit requires careful study. <u>Compare</u> <u>Cannon v. Lockhart</u>, 850 F.2d 437, 440 (8th Cir. 1988) (concluding, after counting votes in the various opinions in <u>McDonough</u>, "It would thus appear that a juror's dishonesty is not a predicate to obtaining a new trial. The focus is on bias.") <u>with</u> <u>United States v. Wright</u>, 119 F.3d 630, 636 (8th Cir. 1997) (after court concludes juror answered question truthfully, <u>McDonough</u> inquiry is over); <u>and</u> <u>United States v. Williams</u>, 77 F.3d 1098, 1100-01 (8th Cir. 1996) (without misleading answer, new trial not warranted). <u>Cf.</u> <u>Skaggs v. Otis Elevator Co.</u>, 164 F.3d 511, 516 (10th Cir. 1998) ("The advent of the [<u>McDonough</u>] test did not eliminate a litigant's broader historic right to prove actual or implied juror bias."), <u>cert. denied</u>, 528 U.S. 811 (1999); <u>Fitzgerald v. Greene</u>, 150 F.3d 357, 362-64 & n.3 (4th Cir. 1998) (holding Sixth Amendment claim can rest on bias alone, but reserving question of whether <u>McDonough</u> plurality allows grant of new trial for inaccurate answer, concealing bias, regardless of dishonesty); <u>Dyer v. Calderon</u>, 151 F.3d 970, 979 n.12 (9th Cir. 1998) (en banc) ("Because we conclude that Freeland lied, we need not decide whether dishonesty is a necessary predicate to a finding of juror bias.") However, this case does not require us to settle the question of whether actual bias alone would warrant a new trial, because the district court found that Tucker "failed to show actual bias on the part of Johnson." 36 F. Supp. 2d at 1116. The finding that Johnson had no duty to respond differently to the voir dire question about bias also tends to establish that she had no bias in fact. Since we have already upheld the finding that she did not conceal bias, Tucker's argument that she actually was biased was substantially decided before we arrived at it; no nuance between the two questions convinces us that the district court erred in finding that Tucker did not show actual bias.

Tucker argues that the district court made a legal error in supposing that Johnson would have had to agree that she was biased before the court could have found that she was. The district court's opinion betrays no such misconception.

Although Tucker's brief does not develop a detailed argument, he at least alludes to the idea of presumed or implied bias--that a juror may have such a close relation to a case that he or she should be deemed biased without regard to subjective state of mind or "actual bias." See generally McDonough, 464 U.S. at 556-57 (Blackmun, J., concurring) and 558 (Brennan, J., concurring in judgment). In the context of jurors sitting on consecutive related cases, we have held that only actual bias of a juror violates the Sixth Amendment. See Johnson v. Armontrout, 961 F.2d 748, 751-53 (8th Cir. 1992) (citing Smith v. Phillips, 455 U.S. 209, 215 (1982)); see also Goeders v. Hundley, 59 F.3d 73, 75-77 (8th Cir. 1995) (failure to strike juror not ineffective assistance where juror not actually biased; court rejects claim that habeas petitioner was harmed by presence of juror whose bias could be presumed). However, in a recent habeas case, we stated that bias could be established "by proof of specific facts which show such a close connection to the facts at trial that bias is presumed." Fuller v. Bowersox, 202 F.3d 1053, 1056 (8th Cir.)(internal quotations omitted), cert. denied, 121 S. Ct. 489 (2000). Here, relying on habeas cases, the district court held as a matter of law that implied or presumed bias could not entitle Tucker to a new trial. 36 F. Supp. 2d at 1116. The habeas cases examine whether circumstances led to a violation of the petitioner's constitutional right, not whether those circumstances would have supported a grant of a new trial. But without resolving whether or not presumed bias can support a grant of a new trial in our circuit, we observe that the idea of presumed bias is reserved for extreme cases, such as when a juror is a close relative of a party or victim in the case. See United States v. Greer, 223 F.3d 41, 53 (2d Cir. 2000). In her concurrence in Smith v. Phillips, 455 U.S. 209, 222 (1982), Justice O'Connor listed extreme situations that would warrant a finding of implied bias: "Some examples might include a revelation that a juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal

transaction, or that the juror was a witness or somehow involved in the criminal transaction." Johnson is not related to the facts or parties of this case in a manner that approaches such an extreme situation. Therefore, the district court did not err in denying Tucker's new trial motion.

We must affirm the district court's holding that Tucker failed to establish his right to a new trial based on juror misconduct at voir dire.

## II.

Tucker also attacks the district court's assessment that there was no evidence of improper outside influence over Johnson. We review a district court's decision on whether to grant a new trial because of outside juror contacts for abuse of discretion. See United States v. Pennington, 168 F.3d 1060, 1067 (8th Cir. 1999); United States v. Cunningham, 133 F.3d 1070, 1075 (8th Cir. 1998). The questions of whether there was improper outside contact and whether such contact was prejudicial are fact questions reviewed for clear error. See United States v. Thomas, 946 F.2d 73, 75-76 (8th Cir. 1991). But cf. Wolff v. Brown, 128 F.3d 682, 686 n.4 (8th Cir. 1997) (noting discrepancy in our cases as to whether we review finding of prejudice under clear error standard or merely give it "substantial weight").

Tucker suggests that Johnson may have been subjected to outside influence by overhearing Tommy McIntosh's statements to Hayes outside her house while she was indoors. There is no direct evidence of this. A new trial order entered on the basis of this theory would be questionable, at the least. But here, Tucker asks us to reverse a district court for not making this imaginative leap. Clearly, the district court acted within its discretion.

Nor is there other, more satisfactory evidence of misconduct. Tommy McIntosh's statement that he believed Johnson and Hayes must have talked because

"[p]eople on juries talk to their husbands" is not a "reasonable inference," as Tucker would have it, but rather an unfounded opinion by someone with no personal knowledge of the facts. To credit Tommy McIntosh's sweeping opinion of juror conduct, we would have to repudiate the usual presumption that jurors follow the instructions of the court. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1989); United States v. Paul, 217 F.3d 989, 997 (8th Cir. 2000).

William Walker's testimony was conclusory to begin with, to the effect that Hayes said he had some discussion with Johnson about the case. On cross-examination, it became clear that Walker did not have any knowledge about two crucial facts: when the putative discussion took place and what was said. Without these facts, there is simply no way to tell whether the discussion Walker was describing was improper or not. Moreover, Walker's credibility as a witness might be affected by his position as a Tucker political ally and business associate.

On the other hand, the only direct evidence on this subject is the testimony of Johnson and Hayes that they did not discuss the case during the trial, except perhaps immaterial statements about scheduling. Johnson testified, "I didn't discuss what went on in the courtroom." Hayes said to his knowledge, Johnson never broke her word not to talk about the trial.

The district court concluded on this record: "The Court is persuaded that Johnson heeded the Court's regular admonition not to discuss the case with anyone." 36 F. Supp. 2d at 1118. This finding is not clearly erroneous. We therefore need not progress further to examine whether any outside contacts were prejudicial. The district court did not abuse its discretion in denying Tucker's motion for a new trial based on outside juror contacts.

***

-19-

We affirm the district court's denial of Tucker's new trial motion, and it follows that we must affirm the conviction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.