# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2362

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Hector Esquivias, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 15, 2004
Filed: August 1, 2005

_____

Before BYE, HANSEN, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Hector Esquivias ("Esquivias") was arrested inside a hotel in Cedar Rapids, Iowa, after a search of his pockets uncovered a key that led to a room in which police found more than 50 grams of crack cocaine. Pursuant to Fed. R. Crim. P. 11, Esquivias entered a conditional guilty plea to possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and

841(b)(1)(A). The district court[1] sentenced him to 51 months' imprisonment. Esquivias appeals the district court's denial of his motion to suppress evidence. We affirm.

## I.    BACKGROUND

On September 25, 2003, Investigator Ryan Abodeely ("Investigator Abodeely") of the Cedar Rapids Police Department Narcotics Division was conducting surveillance for an unrelated case at the Aspen Inn, a two-story hotel in Cedar Rapids. Investigator Abodeely, who was specifically assigned to hotels and motels, observed a gray Jeep Cherokee with Illinois license plates driving slowly on a street near the Aspen Inn. Investigator Abodeely noticed three occupants in the Jeep: a male driver later identified as Esquivias, a male passenger later identified as Richard Barragan ("Barragan"), and a female passenger later identified as Araceli Martinez ("Martinez"). Investigator Abodeely described the passengers as "looking around" and attempting "to find something." About forty-five minutes later, Investigator Abodeely noticed the same Jeep with the same occupants again driving by the hotel, and again the passengers appeared to be looking for something.

Investigator Abodeely informed fellow Narcotics Division Investigator Chip Joecken ("Investigator Joecken") about his suspicions regarding the gray Jeep and its occupants. Later that day, Investigator Joecken, who was also at the Aspen Inn on an unrelated case, observed Esquivias driving alone in a Jeep Cherokee near the hotel. Investigator Joecken observed Esquivias drive into the parking lot of an adjacent hotel, park and enter the Aspen Inn through a side entrance. Investigator Abodeely, who was now inside the hotel on the unrelated matter, observed Esquivias wandering

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, adopting the Report and Recommendation of the Honorable John A. Jarvey, United States Magistrate Judge for the Northern District of Iowa.

the halls on both the first and second floors. Investigator Abodeely observed Esquivias approach the ajar door to Room 211, knock, and walk away when there was no response. Investigator Abodeely found this behavior also to be suspicious but continued to work on the unrelated case.

Still in the hotel, Investigator Abodeely again encountered Esquivias in the second-floor hallway. This time, Investigator Abodeely was accompanied by Investigator Joecken and Cedar Rapids Police Officer John McDaniel ("Officer McDaniel"), who was wearing a police uniform. As Esquivias was walking toward them, Investigator Abodeely identified him to the other officers as the suspicious person he previously observed. Officer McDaniel stayed back while Investigator Abodeely and Investigator Joecken walked up to Esquivias. Investigator Joecken asked Esquivias for identification. Esquivias stated that he did not have identification but gave Investigator Joecken his correct name and date of birth. Investigator Joecken called this information into the police dispatch and determined that Esquivias did not have any outstanding warrants.

While Investigator Joecken was checking for outstanding warrants, Esquivias told Investigator Abodeely that he was trying find his hotel room. Finding this suspicious, Investigator Abodeely asked Esquivias for consent to search his person. The district court found that Esquivias unequivocally and without hesitation gave consent to Investigator Abodeely to search him. During the search, Investigator Abodeely found a motel key card in Esquivias's pocket. When asked about the motel key, Esquivias claimed he received it from an unknown woman and that he was trying to find the room to which the key belonged.

Investigator Joecken and Officer McDaniel stayed with Esquivias while Investigator Abodeely took the room key to the front desk to determine which room it opened. The front-desk clerk told Investigator Abodeely that the key card was assigned to Room 104, which was rented earlier that day. Investigator Abodeely

returned to the second floor hallway and instructed Officer McDaniel to wait with Esquivias as he and Investigator Joecken investigated Room 104. Esquivias was not in handcuffs or restrained in any way, and the officers described him as very cooperative.

Investigator Abodeely knocked on the door of Room 104, and the investigators heard a male voice respond "just a minute." A short time later, Barragan opened the door. Even though Investigator Abodeely and Investigator Joecken were in plain clothes, they showed Barragan their police badges and identified themselves as police officers. They asked Barragan if he knew "Hector," and Barragan responded that Esquivias was his cousin. After asking Barragan several more informational questions, Investigator Abodeely also asked Barragan for permission to "step in the room and speak to him." Barragan granted the officers permission to enter the hotel room, stepped back and opened the door completely. Investigator Abodeely understood Barragan to consent to his entry and walked into the room while Investigator Joecken remained in the hallway.

Upon entering the room, Investigator Abodeely saw Martinez on the bed and noticed a pillow on top of a table in a corner. Investigator Abodeely also saw plastic baggies and rocks of crack cocaine lying in plain view on top of the table next to the pillow. After seeing the cocaine, Investigator Abodeely walked across the room, lifted the pillow, and found a large quantity of crack cocaine, a tin box, plastic bags and an electronic scale. The officers then arrested and handcuffed Barragan and Martinez. Esquivias was also arrested, handcuffed and taken to Room 104. The police officers then obtained a search warrant for Room 104.

At Esquivias's suppression hearing before a magistrate judge, Esquivias, Martinez and Barragan contested many of the facts detailed above. Esquivias stated that when first approached by the officers, he attempted to continue walking, but his progress was blocked by one of the officers. Esquivias also testified that Investigator

-4-

Abodeely did not ask for his consent to a full search of his person and that he only consented to a pat down. Martinez claimed that all three officers came to the door, that she never heard Barragan invite the officers into the room, and that Barragan protested Investigator Abodeely's entry into the room. Barragan testified when he heard a knock on the door he asked who was there, and a voice responded that they were from the front desk. He claimed that he only cracked open the door and that he protested when Investigator Abodeely pushed the door open and entered without asking permission.

After reviewing the magistrate judge's report and recommendation, the district court denied Esquivias's motion to suppress because Esquivias voluntarily consented to the search of his person, and the officers did not violate the law in temporarily detaining him to confirm or dispel their reasonable suspicion of criminal activity. The district court also found that the officers had Barragan's consent to enter Room 104.

## II.    ANALYSIS

On appeal, Equivias argues on a number of grounds that the district court erred in denying his motion to suppress the evidence obtained from Room 104. When considering a denial of a motion to suppress, this Court reviews "the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Petty*, 367 F.3d 1009, 1011 (8th Cir. 2004). "We will affirm an order denying the suppression of evidence, unless the decision lacks the support of substantial evidence, is based on an erroneous view of the law, or this Court is left with a firm conviction that a mistake has been made." *United States v. Roby*, 122 F.3d 1120, 1123 (8th Cir. 1997).

## A.   Scope of Esquivias's Consent

Esquivias first argues that the district court clearly erred in its factual finding that he consented to a full search of his person, rather than a mere pat down.   We disagree.

The district court found that Esquivias provided unequivocal consent to a full search of his person.  Although Esquivias testified at his suppression hearing that the officers only asked, "Can we pat you down?", the district court discredited his testimony and accepted the contrary testimony of the investigating officers.  A district court's "credibility findings are well-nigh unreviewable, so long as the findings are not internally inconsistent or based on testimony that is incoherent, implausible, or contradicted by objective evidence in the case." *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001); *see also United States v. Tucker*, 243 F.3d 499, 506 (8th Cir. 2001) ("When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).   There was nothing incoherent or implausible about the officers' testimony that Esquivias consented to a full search of his person.   For that reason, the district court did not clearly err in finding that Esquivias consented to a full search rather than a mere pat down.

## B.   Voluntariness of Esquivias's Consent

Esquivias also argues that even if he consented to a full search, his consent was not voluntarily given, and the resulting search violated his right to be free from an unreasonable search under the Fourth Amendment to the United States Constitution. Esquivias claims that his consent was not voluntary because he was much smaller than the officers, the officers confronted him in a manner such that he did not feel free

to leave, English is not his first language, he was only 19-years old at the time of the arrest, he did not know he was free to refuse consent, and before giving his consent he tried to leave but his path was blocked by a uniformed officer. We disagree.

A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). A court determines whether consent is voluntary under the totality of the circumstances. *United States v. Gipp,* 147 F.3d 680, 685 (8th Cir. 1998). The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. *United States v. Cedano-Medina*, 366 F.3d 682, 684-85 (8th Cir. 2004). In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, "including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects." *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005). We also consider the environment in which the alleged consent took place, "specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently . . . as the search occurred." *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001).

In this case, the totality of the evidence shows that the officers reasonably concluded that Esquivias voluntarily consented to be searched. Esquivias was 19 years old at the time of his arrest and claimed to have a GED. Although Esquivias claimed English was his second language, he was a lifetime resident of Rockford, Illinois, and there is no evidence that he had any difficulty understanding English. There is no indication that Esquivias was under the influence of drugs or alcohol at

the time of his arrest. While the officers did not inform Esquivias of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary. *United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003). In addition, Esquivias was only detained a short time before he consented to be searched, was not threatened or intimidated by police, did not consent as a result of any promises from police, was not in police custody at the time of his consent, the search occurred in a public hallway, and the investigating officers described him as very cooperative while being searched. Under the totality of these circumstances, the district court correctly held that a reasonable officer would have believed Esquivias's consent to have been voluntary. *See*, *e.g.*, *United v. Fuller*, 374 F.3d 617, 622 (8th Cir. 2004) (holding that the district court did not clearly err in finding consent voluntary where the defendant "was eighteen years old at the time, a high school graduate, and there is no evidence that the police threatened or coerced him").

## C. Seizure of Esquivias During Investigation

Esquivias next argues that the officers violated his right to be free from an unreasonable seizure under the Fourth Amendment both when they stopped him in the hotel hallway and when they detained him while determining the room to which his key card belonged. We disagree.

A law enforcement officer is permitted to stop and briefly detain a defendant for investigative purposes so long as he has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Johnson,* 64 F.3d 1120, 1124 (8th Cir. 1995) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). A *Terry* stop is permissible even when the officer lacks probable cause to make an arrest. *See United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003). Moreover, "[r]easonable suspicion is based on the totality of the circumstances, which are viewed in light of the officer's experience and familiarity

with drug trafficking." *Johnson*, 64 F.3d at 1124 (citation omitted). "[An] officer's suspicion is reasonable if the officer knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed." *Hernandez-Hernandez*, 327 F.3d at 706. "Even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances." *Johnson*, 64 F.3d at 1124.

Under the totality of the circumstances in this case, Esquivias's actions provided the officers with reasonable suspicion to support a *Terry* stop. Investigators Abodeely and Joecken were assigned to the police department's narcotics division and regularly investigated suspicious activity at motels, such as the Aspen Inn, where the investigators were performing surveillance on another drug-related matter. Both Investigator Abodeely and Investigator Joecken noticed Esquivias drive slowly around the hotel. Investigator Abodeely noticed Esquivias do this twice, both times appearing to be looking for something. Investigator Joecken noticed Esquivias drive by the hotel once, and he also saw Esquivias park in the lot of another hotel and enter the Aspen Inn through a side entrance. Investigator Abodeely also noticed Esquivias wandering the halls, seemingly without a place to go. Given the officers' experience in narcotics investigations, especially at Cedar Rapids hotels, Esquivias's behavior provided Investigators Abodeely and Joecken reasonable suspicion to support their initial *Terry* stop.

In addition, what the officers learned upon questioning and searching Esquivias provided reasonable suspicion to detain Esquivias long enough to further investigate whether his suspicious behavior was criminal. Not only were the officers reasonably alerted by Esquivias's wandering through the halls of the hotel, but also the officers learned from Esquivias that he did not know his own room number. Esquivias also lacked any identification and told the officers that he was handed a key card to a room that he claimed to be his room by a woman that he claimed not to know. Again, when combined with the officers' experience with narcotics investigations, the investigators

learned enough from their initial questioning of Esquivias to justify detaining him long enough to determine which room his key opened and why he possessed a key but did not know the room to which it belonged. Therefore, the officers' continued detention of Esquivias was also a constitutional *Terry* stop.

Further, we disagree with Esquivias's contention that any reasonable suspicion that he was engaged in criminal activity dissipated when Barragan identified Esquivias as his cousin. Verifying that those in the hotel room knew Esquivias did not put an end to the officer's suspicion. Rather, upon reaching the hotel room, it was reasonable for the officers to ask "'a moderate number of questions to determine his identity *and* to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)) (emphasis added). After obtaining Esquivias's name from Barragan, it was still reasonable for the officers to ask further questions until they had adequately tested their suspicions regarding Esquivias. To exhaust those suspicions, it was reasonable for the officers to ask to look around Esquivias's room. Upon receiving consent to enter the hotel room, it was reasonable for the officers to detain Esquivias briefly while they confirmed their suspicions about his behavior by investigating the room in which he claimed to be staying.

### D.    Consent to Search Hotel Room

Lastly, Esquivias argues that because he did not provide consent, the officers were required under the Fourth Amendment to obtain a warrant to search his hotel room. We disagree.

Esquivias contends that he had a reasonable expectation of privacy in the hotel room, and, for that reason, the Fourth Amendment mandates that the officers needed a warrant to search the room without his consent. Esquivias is correct that the Fourth

Amendment's prohibition on unreasonable searches only protects people in places where they have a reasonable expectation of privacy. *United States v. Corona-Chavez*, 328 F.3d 974, 980 (8th Cir. 2003). In addition, whether a person has a reasonable expectation of privacy in a motel room depends upon factors such as whether the defendant was ever in the room and whether the defendant checked into or paid for the room. *United States v. Carter*, 854 F.2d 1102, 1105-06 (8th Cir. 1988). We, however, need not decide whether Esquivias had a reasonable expectation of privacy in the hotel room because Barragan voluntarily consented to Investigator Abodeely's search of the hotel room. *United States v. Williams*, 346 F.3d 796, 798 (8th Cir. 2003) ("Where a person having authority over the premises voluntarily consents to a search, however, law enforcement may conduct a warrantless search without running afoul of the Fourth Amendment.").

In response, Esquivias does not contest Barragan's authority to consent to a search of the room, but rather contends that the district court clearly erred in its factual finding that Barragan consented to Investigator Abodeely walking around his hotel room. According to Esquivias, even if the district court correctly found that Barragan granted Investigator Abodeely permission to enter his room, that permission was at most permission to take step or two inside the room. Esquivias argues that Investigator Abodeely exceeded the scope of Barragan's consent by walking far enough into the room that he could see the rocks of cocaine base laying beside the pillow.

We cannot find clear error in the district court's decision to credit Investigator Abodeely's and Investigator Joecken's consistent and coherent testimony that Barragan consented to Investigator Abodeely's entry into the hotel room. *Tucker*, 243 F.3d at 506; *see also Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Moreover, even if Barragan only granted Abodeely verbal consent to "step in," he opened the door fully and stepped back in an inviting manner.

-11-

From these gestures alone, Abodeely could reasonably conclude that Barragan granted him permission to enter the room more than just a step or two. *See Williams*, 346 F.3d at 799 (noting that "consent reasonably implied from behavior" suffices under the Fourth Amendment). Therefore, we reject Esquivias's claims that there was constitutional infirmity in Investigator Abodeely's entry into the hotel room.

## III.   CONCLUSION

For the reasons stated above, we affirm the district court's denial of Esquivias's motion to suppress.

_____