# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3872

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Steven Bradford, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: June 12, 2007
Filed: August 24, 2007

_____

Before MELLOY, SMITH, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Steven Bradford pleaded guilty to conspiring to distribute at least 100 grams of heroin, in violation of 21 U.S.C. § 846. The district court[1] found by a preponderance of the evidence that Bradford sold heroin to an individual identified as J.H. during the course of the conspiracy, and that the sale of heroin to J.H. resulted in J.H.'s death. The district court then sentenced Bradford to 210 months' imprisonment. Bradford appeals his sentence, arguing the following: (1) the district court's finding that

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

Bradford distributed heroin to J.H. is clearly erroneous; (2) the district court erred in departing upward pursuant to U.S.S.G. §§ 5K2.21 and 5K2.1; (3) the district court violated Bradford's Sixth-Amendment and due-process rights when the court increased Bradford's sentence based on a factual finding supported only by a preponderance of the evidence; (4) the district court erred in finding the government had not breached the plea agreement; and (5) the district court erred by denying Bradford a reduction for acceptance of responsibility.[2] For the following reasons, we affirm.

I.      Background

A.      Offense Conduct

Bradford stipulated to the following facts as the factual basis for his guilty plea. On or about September 19, 2005, a confidential informant ("CI") informed law enforcement officers that he had purchased $100 worth of heroin from a person named "Wimp" at an apartment in Cedar Rapids, Iowa, on several occasions in the previous year. That same day, the CI made a recorded phone call to Wimp and arranged to purchase $100 worth of heroin from Wimp at the same apartment.

Later that afternoon, the CI met with Wimp at the apartment. While the CI and Wimp were inside, Bradford and a woman arrived in a Chevrolet Monte Carlo, and Bradford entered the apartment. The CI gave $100 in pre-serialized currency to Wimp, who then purchased three baggies of heroin from Bradford. The total amount of heroin in the baggies was less than one gram.

---

[2]Bradford initially challenged the reasonableness of his sentence. However, in light of our holding, this issue is abandoned due to the statement in Bradford's reply brief that "[i]f Mr. Bradford can be factually, legally and constitutionally punished for J.H.'s death, the 210 month sentence is reasonable."

On September 22, 2005, the CI placed a call to Wimp to set up another purchase of $100 worth of heroin. The CI met Wimp and a female known as "Ran" at the same apartment. The CI gave Ran $100 in pre-serialized currency. Shortly thereafter, Bradford arrived in the Monte Carlo. Ran entered the Monte Carlo and gave Bradford the pre-serialized currency in exchanged for less than one gram of heroin. Ran left the Monte Carlo and gave the heroin to the CI.

After the controlled buy, Bradford left the apartment in the Monte Carlo. Law enforcement officers stopped the vehicle and arrested Bradford on an outstanding warrant. During a search incident to arrest, officers recovered the pre-serialized currency from the just-completed controlled buy. The same day, law enforcement officers executed a search warrant at Bradford's residence in Cedar Rapids. During the search, officers seized a digital scale, baggies, documents, and $1,445 in cash, including the $100 pre-serialized currency from the September 19, 2005 controlled buy.

Bradford pleaded guilty to one count of a three-count superseding indictment. That count charged that, between about 2004 and September of 2005, Bradford conspired to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846. In exchange for his plea of guilty, the government agreed to dismiss the other two counts of the indictment, and it promised not to file "additional Title 21 drug-related criminal charges based upon *or arising from* information now in [the government's] possession." (Italicized words handwritten in the plea agreement). On December 28, 2005, the court accepted Bradford's guilty plea.

B.    Relevant Conduct Background

The following facts are taken largely from testimony at an October 11, 2006 sentencing hearing and the district court's sentencing memorandum. In 2004, the Iowa Division of Narcotics Enforcement ("DNE") participated in an *ad hoc* Drug

Task Force ("Task Force") along with other local and federal law enforcement agencies. The Task Force was formed after a number of individuals died from heroin overdoses in the Cedar Rapids area. The Task Force's investigation led to Bradford's conviction in this case.

DNE Special Agent Joshua Lupkes and DEA Special Agent Jarad Harper participated in the Task Force's investigation. During the investigation, Agent Harper learned that Bradford was a heroin dealer and that his nickname was "B." In June of 2004, there were at least four heroin dealers in the Cedar Rapids area who were using the nickname "B." Agent Harper also found out that Bradford preferred to sell heroin to his customers indirectly. Bradford sold heroin through Winfred Lovelady and Leona Ferguson.

Rachel Hoskins, her boyfriend, James Callanan, and one of her best friends, J.H., were heroin users. Hoskins and Callanan used heroin daily. On June 10, 2004, Hoskins and Callanan were in Cedar Rapids, and J.H. was in Independence, Iowa. At some time during the afternoon or early evening, J.H. called Hoskins and asked her if she could give him a ride to Cedar Rapids. J.H. wanted to go to Cedar Rapids to buy some heroin and a quarter-pound bag of marijuana.

Hoskins and Callanan drove to Independence and picked up J.H. During the drive back to Cedar Rapids, Hoskins used a cell phone to call Bradford. Hoskins knew Bradford as a heroin dealer named "B." She had purchased heroin from him numerous times over the years. Bradford refused to talk to Hoskins, however, and he hung up on her. Bradford had "cut off" Hoskins and Callanan because Hoskins had previously and duplicitously used a Wal-Mart gift card with a zero balance to purchase heroin from Bradford.

Hoskins testified that J.H. then called Bradford using J.H.'s phone, and Bradford called J.H. back. During the conversation, J.H. introduced himself as a

friend of Hoskins and Callanan. Upon arrival in Cedar Rapids, J.H. called Bradford again. After driving around for ten minutes, J.H. received a call back from Bradford, who directed J.H. to the corner of 16th Street SE and 7th Avenue SE.

Around 9:30 to 10:00 p.m., Hoskins parked her car on 16th Street SE between 6th and 7th Avenues SE in Cedar Rapids. Hoskins parked the car behind a van about one-quarter to one-half block from 7th Avenue SE. She parked her car there so that Bradford could not see her or Callanan. After Hoskins parked the car, Bradford called J.H. again. J.H. got out of the car and walked down 16th Street SE towards 7th Avenue SE. At the corner of 16th Street SE and 7th Avenue SE, J.H. met Bradford. Hoskins testified that, sitting in her car, she was able to recognize Bradford. Although the sun had set, she said a streetlight on the opposite side of the street lit the corner.

Less than one minute after meeting, J.H. and Bradford walked down 7th Avenue SE towards 15th Street SE. Bradford had come to the corner from the direction of 7th Avenue SE. The two men walked out of Hoskins's sight. J.H. later approached Hoskins's car from behind and got in. He had a $50 rock of heroin. In Cedar Rapids, heroin users were usually able to purchase a quarter of a gram of heroin for $40 to $50.

After J.H. bought the rock of heroin, Hoskins, J.H., and Callanan went to Callanan's apartment. J.H. and Callanan got high on heroin, and J.H. went into a bedroom to use more. After doing so, his lips turned blue. In a crude attempt to provide medical care, Hoskins gave J.H. mouth-to-mouth resuscitation and sat him up. According to Hoskins, J.H.'s breathing and pulse were then "fine." Throughout the night, Hoskins checked on J.H.

The next morning, J.H. started making a gurgling sound. Hoskins called 911 and attempted to provide CPR. Police officers and paramedics arrived and tried to resuscitate J.H., but he died in the apartment.

Shortly after J.H. died, law enforcement officers took Hoskins to the police station. They asked her where J.H. obtained the heroin. Hoskins told officers she did not know. She told officers she had picked up J.H. near a restaurant in Cedar Rapids, and at that time, he had already used heroin. After further questioning, Hoskins changed her story. She told officers that she and Callanan had driven J.H. to the southeast side of Cedar Rapids and had parked on 17th Street SE near 6th or 7th Avenues SE. She told them that J.H. went into an unknown house and bought heroin from an unknown person. Hoskins told this same story to J.H.'s mother.

In December 2005, approximately a year-and-a-half after J.H.'s death, Special Agent Wade Kisner, another member of the Task Force, interviewed Hoskins. Hoskins changed her story again. This time, Hoskins told Agent Kisner that she had dropped off J.H. on 15th Street SE between 5th and 6th Avenues SE, and that J.H. had purchased the heroin from a dealer she knew as "B" and provided two possible phone numbers for "B." Hoskins testified that she had previously lied to officers because she and Callanan were heroin addicts who did not want to lose their source. They also did not want to get into trouble for helping J.H. buy the heroin that killed him.

On January 5, 2006, Agent Kisner and another Task Force agent again interviewed Hoskins about the circumstances surrounding J.H.'s death. They showed her a photo lineup array of six men and asked if "B" was in the array. Hoskins positively identified Bradford as the "B" who had sold heroin to J.H.

C.   Bradford II

Based on this information, a grand jury charged Bradford in a one-count indictment in a separate case, United States v. Bradford, (Bradford II) 433 F. Supp. 2d 1001 (N.D. Iowa 2006). The indictment alleged that, on or about June 10, 2004, Bradford distributed heroin to J.H., resulting in the death of J.H. from use of the heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c). On April 4, 2006, Bradford filed a motion for specific performance of the prior plea agreement and a motion to dismiss the indictment in Bradford II, arguing that the new charge arose from information the government had in its possession on the date Bradford signed the plea agreement in his earlier proceedings.

On June 2, 2006, the district court granted Bradford's motion for specific performance of the plea agreement and dismissed the indictment in Bradford II, ruling that the indictment was a Title 21 drug-related criminal charge "arising from" information in the government's possession on December 12, 2005. Bradford II, 433 F. Supp. 2d at 1006-07. The government did not appeal this ruling.

D.   Sentencing Proceedings

Meanwhile, on April 26, 2006, the probation office had prepared a presentence investigation report ("PSIR") for the indictment to which Bradford had pleaded guilty. The government initially informed the probation office that it did not have any objections to the PSIR. On June 5, 2006, however, after the court dismissed the indictment in Bradford II, the government informed Bradford and the probation office that it intended to seek an upward departure in Bradford's original case. The government sought a departure based on U.S.S.G. § 5K2.1, asserting that the death of J.H. resulted from Bradford's distribution of heroin during the conspiracy. The amended PSIR indicated that an upward departure might be warranted based on §

-7-

5K2.21, rather than § 5K2.1, because of the court's dismissal of the indictment in Bradford II.

Bradford objected to an upward departure, denied that he sold heroin to J.H., and denied that J.H. died from heroin use. Bradford also argued that an upward departure would be inequitable, contrary to the advisory Sentencing Guidelines, and unconstitutional. On October 11, 2006, the court held a sentencing hearing to determine: (1) whether Bradford distributed heroin to J.H., resulting in J.H.'s death and, if so, (2) whether the court should depart upward.

The government presented evidence from Agents Lupkes and Kisner and Dr. Henry Jackson Carson, an expert pathologist who performed the autopsy on J.H.'s body. Dr. Carson testified that, in his opinion, the use of the heroin initiated an asthma attack or an allergic reaction and was the proximate cause of J.H.'s death. Hoskins also testified on the government's behalf. Bradford's mother, Linda Bradford, testified at the sentencing hearing on Bradford's behalf with a purported alibi defense.

On November 8, 2006, the district court filed a sentencing memorandum, finding by a preponderance of the evidence that Bradford "sold J.H. heroin and that such heroin resulted in his death." The court found the testimony of Hoskins to be credible, despite the court's "recogni[tion] that Hoskins has made inconsistent statements in the past." In contrast, the court did not find the testimony of Bradford's mother to be credible.

The court then calculated the advisory Guidelines range. The court accepted the parties' stipulated base offense level of 26. See U.S.S.G. § 2D1.1(a)(3) and (c)(7). The court then denied the three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The court stated that Bradford had "repeatedly denied that he sold heroin to J.H." and had thus had not met his burden

to show that he accepted responsibility.  The court added that even if the denial of relevant conduct was insufficient to keep Bradford from receiving a reduction for acceptance of responsibility, the court believed that he suborned perjury and knowingly presented a false alibi by having his mother testify falsely.  The court found that "[t]his also indicates a lack of acceptance of responsibility."

Thus, before any departures, the court found an offense level of 26, which, when combined with Bradford's criminal history category III, resulted in an advisory Guidelines range of 78 to 97 months' imprisonment.  The court also noted that the offense of conviction carries a statutory minimum sentence of five years' imprisonment and a statutory maximum of forty years' imprisonment.

The court then discussed the application of an upward departure.  The court first ruled that the government's motion for an upward departure in this case was not "an impermissible 'end run' around" the court's order to dismiss the indictment in Bradford II.  The plea agreement stated that "[t]here are no other applicable upward or downward adjustments to [D]efendant's offense level under Chapters 2 and 3," and is silent regarding Chapter 5 departures.  Accordingly, the court found "that the parties are free to litigate all [Chapter 5] departure issues at sentencing."  The court concluded that Bradford "knowingly, voluntarily and intelligently waived his right to a jury trial on Count 1 and remains liable for an upward departure to the statutory maximum of 40 years' imprisonment for such offense."

Next, the court ruled on Bradford's due-process and Sixth-Amendment claims. The court found that because the government did not seek to increase his sentence beyond the statutory maximum, there was no constitutional violation.  The court also rejected Bradford's argument that the facts that would lead to a departure in this case—whether Bradford sold heroin to J.H., which resulted in J.H.'s death—must be proven beyond a reasonable doubt.

The court then found that this case fell outside the "heartland" of U.S.S.G. § 2D1.1, and that a departure was proper under such circumstances. The court determined that application of U.S.S.G. § 5K2.21, "Dismissed and Uncharged Conduct," was appropriate here because Bradford's "distribution of heroin resulting in the death of J.H. is conduct underlying Count 1 of the Indictment in Bradford II, a potential charge dismissed as part of a plea agreement in this case," and because J.H.'s death was not taken into account in the court's determination of the applicable Guidelines range. The court also found that U.S.S.G. § 5K2.1, "Death," "would clearly be appropriate" had the court not departed pursuant to § 5K2.21.

The court then stated that, hypothetically, if Bradford would have been convicted of distribution of heroin resulting in death, he would have had a base offense level of 38. U.S.S.G. § 2D1.1(a)(2). When combined with Bradford's criminal history category III, his advisory Guidelines range would have been 292 to 365 months' imprisonment. The court varied downward from this hypothetical range based on the sentencing factors of 18 U.S.C. § 3553(a), and sentenced Bradford to 210 months' imprisonment.

The court also stated that "[i]n the event that the court is mistaken about the propriety or extent of an upward departure pursuant to § 5K2.21 . . . the court would nonetheless exercise its discretion under Booker, vary upward, if necessary, and impose a sentence of 210 months' imprisonment" based on § 3553(a) factors.

Bradford now appeals his sentence, arguing that: (1) the district court's finding that Bradford distributed heroin to J.H. is clearly erroneous; (2) the upward departure under U.S.S.G. § 5K2.21 was improper; (3) Bradford's Sixth-Amendment and due-process rights were violated; (4) Bradford's plea agreement with the United States was violated; and (5) Bradford is entitled to acceptance of responsibility. We address each argument in turn.

II.    Analysis

   A.    District Court's Finding of Fact

Bradford first challenges the district court's finding that Bradford sold heroin to J.H. We will affirm the district court's findings of fact on sentencing matters unless they are clearly erroneous. See Rita v. United States, 127 S. Ct. 2456, 2471 (2007) (Stevens, J., concurring) (stating that appellate courts are to "'give due regard to the opportunity of the district court to judge the credibility of the witnesses'" and to "'accept the findings of fact of the district court unless they are clearly erroneous'") (quoting 18 U.S.C. § 3742(e)) . Bradford argues that the district court's factual finding is clearly erroneous because the government's sole witness linking him to J.H., Hoskins, was not credible.

While a district court's credibility findings are "virtually unassailable on appeal," United States v. Watson, 479 F.3d 607, 611 (8th Cir. 2007) (quotation omitted), there are "three specific ways in which a finding based on credibility could be erroneous." United States v. Tucker, 243 F.3d 499, 506 (8th Cir. 2001). "First, the accepted testimony could be incoherent or facially implausible. Second, the testimony could be contradicted by extrinsic evidence. Third, the finding itself could be internally inconsistent." Id. (internal citation omitted).

In support of his argument, Bradford contends that Hoskins's testimony was "contradicted by extrinsic evidence" and was "incoherent [and] facially implausible." Id. Bradford first points to the extrinsic evidence of cell phone records that he claims are "at odds with" Hoskins's testimony at the sentencing hearing. Although Hoskins testified that she did not exactly remember the sequence and duration of the telephone calls between J.H. and "B," she remembered there being several calls to and from "B." She also testified that she and J.H. used both her phone and J.H.'s phone when making calls to "B."

-11-

The government introduced cell phone records for Hoskins, J.H., and the number alleged to belong to Bradford.[3] The records show three calls from Hoskins's phone to Bradford's phone on the night of June 10, 2004: a four-second call that went to voice-mail, a twenty-seven-second call that was answered, and a four-second call that was answered. According to Hoskins's testimony, the first two calls were made by Hoskins herself, and the third call was made by J.H. The records show no calls from Bradford's phone to either Hoskins's or J.H.'s phone. Bradford argues that this fact contradicts Hoskins's testimony and makes the district court's finding that Hoskins was credible clearly erroneous.

Bradford also argues that Hoskins's "version of events strains credulity" for the following reasons: (1) "a heroin dealer [would not] sell to an unknown buyer, J.H., based on a referral by a scam artist and a deadbeat[;]" (2) the alleged deal was not consistent with Bradford's modus operandi; (3) Hoskins gave "at least three different versions of the events of the night of June 10, 2004, to authorities[;]" (4) Hoskins's identification of Bradford was made approximately a year-and-a-half after the alleged distribution of heroin to J.H; (5) Hoskins had limited ability to observe the transaction; (6) Hoskins's testimony was inconsistent with other evidence, including her own prior statements; and (7) Hoskins never saw anyone hand heroin to J.H. Therefore, Bradford contends that we must reverse the district court's factual finding.

We disagree. "We may reject the fact finder's choice between conflicting evidence only where there is something wrong with the choice." Id. at 506. We recognize, and are troubled by, the paucity of the evidence offered to prove that Bradford sold heroin to J.H. The only evidence offered was the testimony of Hoskins,

---

[3]Bradford states that the fact that "the phone number at issue for 'B' belonged to Bradford is also in dispute," as Hoskins originally gave Agent Kisner a different phone number for the dealer "B." Bradford does not specifically appeal the district court's finding of fact on this issue; therefore, we will assume that the number the government introduced as belonging to Bradford did, in fact, belong to Bradford.

who had previously told law enforcement officers two different stories. Hoskins's testimony, however, is not "too implausible" to support a finding that Bradford sold heroin to J.H. Id. at 506. Hoskins testified with certainty that Bradford was the dealer who sold J.H. heroin on the night preceding his death. She explained her previous stories as falsehoods intended to ensure a continued supply of heroin and to keep her and Callanan out of trouble. As for the inconsistencies between Hoskins's testimony and the phone records, the sentencing hearing took place two-and-a-half years after J.H.'s death, and it is reasonable for the court to conclude that Hoskins was honestly mistaken in her recollection about details of the phone calls made the night before J.H.'s death.

Further, the district court's finding that Bradford's mother's story was not credible also lends support to the court's decision to believe Hoskins's story and not Bradford's. If the court believed that Bradford had lied by putting on a false alibi defense, "it could have inferred that he was dissembling" to cover up wrongdoing or guilt. United States v. Barraza Cazares, 465 F.3d 327, 333 (8th Cir. 2006). While we cannot say that we would have come to the same conclusion as the district court, there is nothing "wrong with" the district court choosing to believe Hoskins's story instead of Bradford's. Tucker, 243 F.3d at 506; see Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Therefore, we must affirm the district court's finding of fact on this issue.

B.     Upward Departure Pursuant to U.S.S.G. § 5K2.21[4]

Bradford next argues that the district court erred by granting an upward departure pursuant to U.S.S.G. § 5K2.21.  "We review the district court's decision to grant an upward departure for abuse of discretion."  United States v. D'Andrea, 473 F.3d 859, 863 (8th Cir. 2007).

A sentencing court may depart from the Guidelines range if the court finds "that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines[.]"  U.S.S.G. § 5K2.0(a)(1).  A departure "may be warranted" based on circumstances of a kind not adequately taken into consideration "in determining *the applicable guideline range*."  § 5K2.0(a)(2)(A) (emphasis added).  The court based its departure on U.S.S.G. § 5K2.21, "Dismissed and Uncharged Conduct."  Section 5K2.21 provides that:

> The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of *the applicable guideline range*.

U.S.S.G. § 5K2.21 (emphasis added).

Bradford argues that the Sentencing Commission took the uncharged conduct (distribution of heroin resulting in death) into consideration when it crafted §

---

[4]Bradford also challenges the district court's alternative upward departure based on U.S.S.G. § 5K2.1, "Death."  Because we find the district court's upward departure pursuant to § 5K2.21 proper, we do not reach the court's alternative finding that § 5K2.1 would also apply in this case.

2D1.1(a)(2). Bradford is correct; § 2D1.1(a)(2) does specifically provide for this conduct. However, as stated above in both the general statement regarding departures and the specific departure provision applied here, a departure may be applicable even if not established by the offense of conviction if the circumstances were not taken into consideration "in determining the applicable guideline range." Section § 2D1.1(a)(2) did not figure into the determination of Bradford's base offense level. Based on the district court's ruling in <u>Bradford II</u>, the government was not allowed to charge Bradford with distribution resulting in death, and § 2D1.1(a)(2) applies only if "*the offense of conviction* establishes that death or serious bodily injury resulted from the use of the substance." U.S.S.G. § 2D1.1(a)(2) (emphasis added). Thus, the court's determination that Bradford's base offense level did not take death into account was not erroneous, and the uncharged, relevant conduct (distribution resulting in death) was a proper ground for departure.

## C. Constitutional Right to a Jury Trial

Bradford next argues that the district court's upward departure violated his Sixth-Amendment right to a jury pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and <u>United States v. Booker</u>, 543 U.S. 220 (2005), because any fact that increased his sentence should have been found beyond a reasonable doubt by a jury. Bradford also contends that, under the Due Process Clause, the court was required to find beyond a reasonable doubt that he had sold heroin to J.H. and that the heroin resulted in J.H.'s death because these findings resulted in a considerable increase in his sentence. We review constitutional challenges to a sentence de novo. <u>United States v. Gallimore</u>, No. 06-3792, 2007 WL 1804394, *2 (June 25, 2007).

Our cases are clear that, post-<u>Booker</u>, courts can find sentence-enhancing facts based on a preponderance of the evidence, <u>see, e.g.</u>, <u>United States v. Okai</u>, 454 F.3d 848, 851-52 (8th Cir. 2006); <u>United States v. Garcia-Gonon</u>, 433 F.3d 587, 593 (8th Cir. 2006), without violating the defendant's Sixth-Amendment rights. One exception

exists, however, for situations in which the defendant's due-process rights are implicated because "the magnitude of a proposed departure dwarfs the guideline range applicable to the substantive offense[] of conviction." United States v. Kikumura, 918 F.2d 1084, 1089 (3d Cir. 1990). In such a case, "the sentencing enhancement becomes the 'tail which wags the dog of the substantive offense.'" Okai, 454 F.3d at 852 (quoting United States v. Townley, 929 F.2d 365, 369 (8th Cir. 1991)); see also McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) ("The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense."). However, while a number of circuits have acknowledged that this exception exists,[5] very few have actually applied it.[6] The Third Circuit found the preponderance standard inadequate in Kikumura, and held that due process required clear and convincing evidentiary support for the facts relied upon to enhance the sentence. Kikumura, 918 F.2d at 1102. In Kikumura, the Guidelines dictated a range of 27 to 33 months' imprisonment (level 18, category I) for passport offenses and possession of explosives. Id. at 1094. However, after finding that the defendant acquired the explosives as an international terrorist and planned to kill large

---

[5]The Supreme Court has recognized that several circuits have held that "in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." United States v. Watts, 519 U.S. 148, 156 (1997). The Court has not, however, expounded on this issue. See id. ("The cases before us today do not present such exceptional circumstances, and we therefore do not address that issue.").

[6]Our court has not expressly disavowed this exception post-Booker. A number of circuits, however, have expressed doubt about the continued application of Kikumura post-Booker, and the Seventh Circuit has done away with the exception all together. See United States v. Grier, 475 F.3d 556, 568 n.8 (3d Cir. 2007) (en banc) ("While we acknowledge that the statutory and constitutional underpinnings of [Kikumura] may be questioned by the Supreme Court's reasoning in Booker, this case does not present a factually similar case . . . [t]herefore, it is not necessary for us to reach the current status of Kikumura."); United States v. Reuter, 463 F.3d 792, 793 (7th Cir. 2006) (stating that the debate over the existence of this exception "has, we believe, been rendered academic by United States v. Booker").

-16-

numbers of people, the district court departed upward and imposed a sentence of thirty years (equivalent to level 40, category I).  Id. at 1098.

The Ninth Circuit[7] has also applied the exception and has required a district court to find certain sentence-enhancing facts by clear and convincing evidence when a judicial finding of fact has a disproportionate impact on the defendant's sentence. See, e.g., United States v. Jordan, 256 F.3d 922, 929 (9th Cir. 2001) (holding that the failure to apply the clear and convincing evidence standard of proof to sentence-enhancing facts was erroneous); United States v. Mezas de Jesus, 217 F.3d 638, 643 (9th Cir. 2000) (same); United States v. Hopper, 177 F.3d 824, 833 (9th Cir. 1999) (same).

Our court has often alluded to this exception, but has never found a case with facts sufficient to fall within the exception.  See, e.g., Okai, 454 F.3d at 852; United States v. Archuleta, 412 F.3d 1003, 1007-08 (8th Cir. 2005); United States v. Anderson, 243 F.3d 478, 485-86 (8th Cir. 2001).  All we can glean from these cases regarding how high a sentencing enhancement would need to be for the "tail to wag the dog" is dicta in Townley stating that an eighteen-level increase in the defendant's base offense level and a seven-fold increase in the permissible sentencing range is an "extreme" case where due process requires clear and convincing evidentiary support. Townley, 929 F.2d at 369-70.  Bradford was subject to the equivalent of a twelve-level enhancement based on the court's finding by a preponderance that Bradford distributed heroin to J.H. resulting in J.H.'s death, and the new range/actual sentence constituted nearly a four-fold increase in his sentencing range.  His actual sentence (after a downward variance outside the new, hypothetical Guidelines range) was 210 months—113 months above the high-end of his original Guidelines range (before the

<hr>

[7]The Ninth Circuit has continued to recognize this exception post-Booker.  See United States v. Pike, 473 F.3d 1053, 1057 (9th Cir. 2007) (discussion circumstances under which the district court is required to find sentencing-enhancing fights under a clear and convincing evidence standard of proof).

upward departure). Our court has upheld a sentence based on facts found by a preponderance that have raised a sentencing range four-fold. See United States v. Alvarez, 168 F.3d 1084, 1088 (8th Cir. 1999). Thus, based on our precedents, we cannot say that the district court's finding of fact in this case raised Bradford's sentence high enough to require a finding based on clear and convincing evidence.

D.    Plea Agreement

Bradford also argues that the government's motion for an upward departure pursuant to §§ 5K2.1 and 5K2.21 violated the plea agreement. We review the interpretation and enforcement of a plea agreement de novo. United States v. Van Thournout, 100 F.3d 590, 594 (8th Cir. 1996). The agreement states that the government would not file "additional Title 21 drug-related criminal charges based upon or arising from information now in [the government's] possession," and that there were no applicable adjustments (other than those mentioned in the agreement) under Chapters 2 or 3 of the Guidelines. The agreement was silent as to Chapter 5 departures.

Bradford argues that "allowing an upward departure under Chapter 5 for the death of J.H. completely eviscerates the agreement that the United States would bring no additional Title 21 charges and the District Court's finding that the second [i]ndictment violated the Plea Agreement." If he had not successfully moved to enforce the plea agreement, the government "would have been required to convince a jury . . . beyond a reasonable doubt that . . . Bradford distributed heroin to J.H. resulting in his death."

While Bradford may have ended up in a worse position by pleading guilty and successfully enforcing his plea agreement, the district court is correct; the plea agreement was silent regarding Chapter 5 departures, and Bradford was aware that the offense to which he was pleading guilty carried a statutory maximum punishment of

forty years' imprisonment.  Because the plea agreement is silent on the issue of Chapter 5 departures, we agree with the district court that the government did not violate the agreement when it sought the upward departure.

E.      Acceptance of Responsibility

Bradford next argues that the district court erred by finding that he had not accepted responsibility and was thus ineligible for a downward adjustment pursuant to U.S.S.G. § 3E1.1.  The defendant bears the burden of proving he is entitled to a § 3E1.1 adjustment.  United States v. Tjaden, 473 F.3d 877, 879 (8th Cir. 2007).  "We review the District Court's decision to deny an acceptance-of-responsibility reduction for clear error."  United States v. Bell, 411 F.3d 960, 963 (8th Cir. 2005).  This determination by the court is "entitled to great deference on review."  Id. (quoting U.S.S.G. § 3E1.1, comment. n.5).

The application notes to § 3E1.1 state, in part, that:

[A] defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under [this section].  A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection.  However, *a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.*

U.S.S.G. § 3E1.1, comment. n.1(a) (emphasis added).  The notes also state that the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment. n.2.

The issue is thus whether Bradford "falsely denie[d] or frivolously contest[ed]" the fact that he distributed heroin to J.H. and that J.H. died as a result.  Based on the

district court's finding of those facts, and the fact that Bradford "repeatedly denied that he sold heroin to J.H.," the court determined that Bradford falsely denied relevant conduct and thus had not met his burden to show that he accepted responsibility. See United States v. Annis, 446 F.3d 852, 858 (8th Cir. 2006) (affirming the district court's finding that the defendant "falsely denied or frivolously contested his relevant conduct" where the defendant "refused to admit to any quantity of [methamphetamine]" and challenged the reliability of his previous statement regarding drug quantity); United States v. Greger, 339 F.3d 666, 673 (8th Cir. 2003) (holding that the defendant acted "in a manner inconsistent with acceptance of responsibility" when he contested relevant conduct that the court found to have taken place) (internal quotation omitted). Alternatively, the court found that Bradford suborned perjury when he knowingly presented the court with a false alibi witness, his mother. The court found Bradford's mother's testimony "patently false." A defendant who suborns perjury has not demonstrated acceptance of responsibility. See U.S.S.G. § 3E1.1, comment. n.4 (stating that conduct resulting in an enhancement under § 3C1.1, which includes suborning perjury, "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct").

Bradford's argument for an acceptance-of-responsibility adjustment would have been stronger had he simply contested the issue of fact at the sentencing hearing, but otherwise remained silent. We agree with the district court, however, that the act of putting forth what the court determined to be a false alibi does not demonstrate acceptance of responsibility. The district court did not commit clear error by denying Bradford a reduction for acceptance of responsibility.

III.    Conclusion

The Supreme Court's statement in Blakely v. Washington, encapsulates the difficult principle at issue in this case:

> Those who would reject <u>Apprendi</u> are resigned to one of two alternatives. The first is that the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge. This would mean, for example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing a firearm used to commit it—or of making an illegal lane change while fleeing the death scene. Not even <u>Apprendi's</u> critics would advocate this absurd result. The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish.

<u>Blakely</u>, 542 U.S. 296, 306-07 (2004) (internal citation omitted). Because of the remedial provision in <u>Booker</u>, however, this is the state of the law today. <u>See</u> <u>Cunningham</u>, 127 S. Ct. 856, 866 (2007) (stating that a majority of the Court in <u>Booker</u> agreed that "the Federal Guidelines would not implicate the Sixth Amendment were they advisory"); <u>Okai</u>, 454 F.3d at 851. As long as a fact-finding encompasses "relevant conduct" as defined by the Guidelines, the district court is free to find facts that increase a defendant's sentence, with the only outer limits being the statutory maximum for the crime of conviction, the (perhaps unlikely) possibility that a court would find a departure extreme enough to apply the <u>Kikumura</u> rule, and the bounds of reasonableness. None of these principles were violated in this case; therefore, we affirm the judgment of the district court.

_____