# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2330

_____

United States,                              *
                                            *
    Plaintiff - Appellee,                   *
                                            *  Appeal from the United States
v.                                          *  District Court for the
                                            *  District of Minnesota.
Yvonne Delores Garth, formerly              *
known as Yvonne Caldwell,                    *
                                            *
    Defendant - Appellant.                  *

_____

Submitted: February 13, 2008

Filed: September 3, 2008

_____

Before RILEY, JOHN R. GIBSON, and BENTON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Yvonne Garth was convicted of two counts of conspiring to defraud the United States with respect to claims against the government in violation of 18 U.S.C. § 286 and six counts of aiding and abetting the making of false claims against the government in violation of 18 U.S.C. §§ 2 and 287. The first conspiracy count alleged that, while working as a tax preparer, she conspired with tax filers by providing false 2001 tax returns claiming an undeserved refund. The second conspiracy count alleged that she provided false W-2 documents to filers so that they could have a return prepared by a legitimate tax preparer for the 2002 and 2003 tax years claiming refunds

they were not owed. She brings this appeal raising three principal arguments: (1) the government varied from the indictment by proving multiple conspiracies rather than the two single conspiracies charged; (2) the district court[1] violated her Sixth Amendment right to trial by jury and her Fifth Amendment right to due process by making sentencing findings using the preponderance of the evidence standard; and (3) the district court violated her Sixth Amendment right to confront the witnesses against her when it admitted the tax returns of non-testifying tax filers to prove that they filed false returns and conspired with her to do so. She also raises several evidentiary challenges based on the Federal Rules of Evidence. We affirm.

We state the facts in the light most favorable to the jury verdict. United States v. Hudspeth, 525 F.3d 667, 671 (8th Cir. 2008). Yvonne Garth (then Yvonne Caldwell) worked at a Jackson Hewitt Tax Services franchise, under the supervision of franchise holder Paul Hahn, during the 2001 tax season, which ran through the early months of 2002. Hahn's franchises catered to persons who required assistance filing simple, inexpensive tax returns. He operated several storefronts in the Twin Cities area, some of which were permanent stores and others of which were seasonal locations that operated only during tax season. All of the returns at Jackson Hewitt were prepared using computer software. Hahn explained that the software did a lot of the work necessary to complete a return, making extensive training and vetting of preparers unnecessary. The preparer would answer a series of questions asked by the software and based on the responses, the software would request specific data about the taxpayer. In order to reduce errors, the software would require important information to be typed twice, including the taxpayer's social security number, W-2 wage information, and employer's tax identification number. After the return was complete, several copies were printed, and the taxpayer was required to review and sign the return. The returns were filed with the IRS electronically, but Jackson Hewitt

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, presided over the trial.

kept other documents relating to the filed return in the records department, and in most instances those documents were signed by the tax filer. To prevent fraud, preparers were also required to photocopy or view each taxpayer's social security card and the card of each dependent he intended to claim.

Hahn operated a seasonal store at Lake Street and First Avenue (the East Lake Street store) out of the lobby of a check cashing business in a less desirable area of town. A return prepared at the East Lake Street store could be identified by a unique number that was assigned to each tax return by the tax preparation software. On an electronically filed return, the computer printed the name of the preparer at the bottom of a return, which it recognized because each preparer had to log-on to the software with a unique identifier. When an East Lake Street store customer received a refund check for his tax return through Jackson Hewitt , the check was stored in the secured area of the adjacent check cashing store and was handed to the customer by employees of that business, not employees of Jackson Hewitt.

According to Hahn, he hired Garth because she claimed prior experience completing tax returns. Upon her hiring, Garth asked to work in the East Lake Street store, and she was the only tax preparer who was permanently placed there. While Garth worked at Jackson Hewitt, three different receptionists worked with her: Garth's daughter, Latrina Caldwell; then briefly Ranika Evans; and finally Starsha Wyatt, whom Garth recommended for the job. None were tax preparers, and according to co-owner Sally Hahn, none were given the computer password to prepare returns under Garth's name. All but Evans were referred to at trial as co-conspirators. Garth ended her employment with Jackson Hewitt sometime between March 1, 2002 and March 15, 2002, after preparing 197 paid returns. According to Hahn, she was never replaced, and the East Lake Street store was closed.

The indictment against Garth alleges two separate, but similar conspiracies. The first conspiracy revolved around her employment as a tax preparer at the East

Lake Street store and covered the term of that employment during the 2001 tax season. The government presented over ten witnesses to prove conclusively that each witness filed false tax returns, claiming credits and tax refunds for amounts which they were not owed by the government. When confronted at trial, these tax filers admitted that their tax returns reported wages, expenses, charitable contributions, and other credits which they did not make nor earn. Most witnesses, however, claimed ignorance of the fraud, testifying that they did not actually read the return before signing it and had no knowledge that their return was inaccurate. In most instances, there was evidence suggesting that the tax filers knew their returns were false because they had signed statements under penalties of perjury that they read and agreed the return was accurate to their knowledge.

The government also proved with sufficient evidence that Garth was the tax preparer for each return. All but one of the witnesses admitted that their return was prepared at the East Lake Street store where Garth worked, and each tax return was filed listing Garth as the preparer. However, only three witnesses, Lisa Evans, Hope Jackson, and Nina Horne, affirmatively identified Garth as the preparer of their false tax return. Most of the witnesses were never asked if they remembered who prepared their return. To prove that Garth was responsible for each return, the government relied largely upon the fact that her name was listed as preparer on the electronically filed returns, meaning that they were prepared under her computer password at the East Lake Street store, and the fact that Garth's name was signed to the paperwork stored by Jackson Hewitt for most of the returns.

There was also an issue at trial as to whether the returns were prepared mistakenly or intentionally, but the evidence at trial supported the inference that Garth acted purposefully. Paul Hahn testified that the computer software prevented typographical errors. Moreover, Evans testified that Garth demanded a share of Evans's refund when she returned to the store to retrieve it. When Evans refused, she heard Garth or another person sitting next to Garth say that "[t]hey are from Chicago

and they break legs."  Although he did not affirmatively identify Garth, Marshal Wylie testified that his tax preparer asked him for more money or a gift, which he refused, when he returned to the East Lake Street store to pick up his refund.  Lisa Norris was in jail when her false return was filed and when her refund checks were cashed.  Her federal refund check was endorsed to Latrina Caldwell, Garth's daughter, and the state check was endorsed to Starsha Wyatt, the receptionist at the East Lake Street store, whom Garth had recommended for employment.  Kevin Garth, the defendant's nephew by marriage, filed a 2001 tax return, prepared by Garth, falsely claiming wages from Footlocker.  He claimed to have gotten the false W-2 from someone off the street and given it to Garth to prepare his returns, but no such W-2 was found in Jackson Hewitt's files.  In addition to the witness testimony, the court admitted into evidence the returns and tax documents of other non-testifying tax filers who allegedly participated in the conspiracy with Garth.

The second conspiracy alleged in the indictment concerned an agreement among several individuals who used false W-2 forms that allegedly came from Garth to claim fraudulent refunds from the government.  In connection with this conspiracy, Garth was indicted of aiding and abetting seven individual tax filers in making false claims.  The government introduced evidence showing that Garth, in exchange for a fee or a percentage of the refund, would provide a false W-2 in the taxpayer's name, using a legitimate, or nearly legitimate, employer identification number and name.  Often, she would act through an intermediary.

For example, Natasha Davis testified that she met Garth through her child's father, Richard Porter.  Davis gave Garth her name and address, and Garth provided her with a 2003 W-2 claiming false wages earned and taxes paid from Foot Locker, a company Davis admitted she did not work for in 2003.  Garth and Davis had an agreement that Davis would pay Garth $500 when she received her tax refund.  Davis used the W-2 to file a false return and ultimately received a refund on a Visa check card.  According to Davis, Garth showed up at Davis's house with her son  to collect

her share shortly after learning that Davis had received the refund. Garth, her son, her daughter Latrina, and Davis all waited at Davis' house while Porter went to get cash from the check card. Porter returned and Garth was paid $500. Davis also listed several other individuals she knew who also transacted similarly with Garth: Jessica Gregory, Lakisha Hammond, Tamika Jones, Shantey Williams, Antonne Walker, Etwon ("Skittles") Glover, and the aforementioned Porter.

Kimberly Pearson was convicted of filing a false tax return using a W-2 she obtained through Antonne Walker. According to her testimony, she paid Walker $1,500 to give to the person who had created the W-2. She later watched Walker give the money to Garth in front of her house. Despite Pearson's affirmative identification of Garth, the jury acquitted Garth of aiding and abetting Pearson. Walker testified that he was convicted of filing a false return, using a W-2 claiming wages earned from an employer, City of Minneapolis, for whom he never worked. He claimed to have gotten the W-2 from a woman named either Kiesha or Killa on Lake Street. He denied knowing Garth or getting the W-2 from her. Agent Jeremy Martin testified, however, that Walker told him in prior interviews that he got both his own W-2 and Pearson's W-2 from Garth.

Chentia Hodroff used a false W-2 for the 2003 tax year from the City of Minneapolis, an employer for whom she never worked. She claimed to have gotten the W-2 from Ray Robinson. Nicole Octavia Williams testified that her forged Footlocker W-2 came from a man named Ray, whom she met in a bar. She only knew that Ray got the W-2 from a female. Shantey Williams used a false W-2, which she got through a man nicknamed "Skittles," from the City of Minneapolis, where she never worked, She said "Skittles" told her that a woman named "Von" was the source of the false document. "Skittles's" involvement in the criminal activity was corroborated by Natasha Davis. Jerome Roberson also used a forged City of Minneapolis W-2, which he purchased through a female who claimed to have gotten it through a relative named Yvonne.

-6-

Termone Realford used a forged W-2 from Foot Locker to file his tax return and claim a refund for the 2003 tax year. After first denying it, he finally admitted that he previously told investigators that a "Donte" offered to get a blank W-2 for Realford from his mother, a woman named Yvonne. He then claimed he had been lying and that the forged W-2 had appeared in his mailbox one day. Other W-2 forms for non-testifying tax filers were also introduced and shown to be false. Several could be connected to Garth by familial relationships. One belonged to her son, Donte Caldwell, and another was used by her daughter, Latrina Caldwell. These and other facts formed the basis of the government's proof at trial.

I.

The district court found that Garth's Sentencing Guidelines' base offense level was six and her criminal history category was II. She was assessed a twelve-level increase based on the amount of the attempted false claims, which the district court found by a preponderance of the evidence to be $280,852, a two-level increase because she was a tax preparer, and a four-level increase for organizing or leading a criminal activity that involved five or more participants. Her total offense level was calculated at twenty-four, and her advisory sentencing range was 57-71 months. The district court sentenced Garth to 57 months. She argues that the district court's findings that she was responsible for $280,852 in attempted false claims and that she was a leader or organizer of more than five people violated her Sixth Amendment right to a trial by jury and her Fifth Amendment due process right to have facts found beyond a reasonable doubt. She also argues that the district court erred by considering summary tax tables at sentencing.

## A.

We review de novo Garth's claim that the sentencing procedure violated her due process and Sixth Amendment rights. See United States v. Martinez, 339 F.3d 759, 761 (8th Cir. 2003). Garth's argument can be boiled down into two separate issues for our consideration. First, she claims a right to have tax loss amounts considered by the jury and relies upon Cunningham v. California, 549 U.S. 270 (2007). We distinguished the mandatory state sentencing statute in Cunningham from the advisory Sentencing Guidelines in United States v. Marston, 517 F.3d 996, 1006 (8th Cir. 2008). As long as the district court applies the Guidelines in an advisory fashion, the Sixth Amendment right to a jury trial is not infringed when the district court finds facts in support of the sentence imposed. Id.

Second, Garth contends that the district court violated her due process rights by failing to apply a heightened evidentiary standard of proof to the amount of false claims and to the finding that she was an organizer or leader of five or more people. It is well-understood that generally a district court may rely on facts found by a preponderance of the evidence to aid it at sentencing. See e.g., United States v. Bradford, 499 F.3d 910, 919 (8th Cir. 2007), cert. denied, 128 S. Ct. 1446 (2008). We have, however, said that there could be circumstances where due process would require those facts that have an "extremely disproportionate" effect on a defendant's sentence to be found by a heightened standard, although we have never required such a standard to be applied. United States v. Calva, 979 F.2d 119, 122 (8th Cir. 1992); Bradford, 499 F.3d at 919; United States v. Townley, 929 F.2d 365, 369 (8th Cir. 1991) ("[T]he preponderance standard the Court approved for garden variety sentencing determinations may fail to comport with due process where, as here, a sentencing enhancement factor becomes 'a tail which wags the dog of the substantive offense.'") (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986)); see also United States v. Galloway, 976 F.2d 414, 425-26 (8th Cir. 1992) (en banc) ("It is clear that the Constitution limits a legislature's ability to designate some factors as elements

of the crime and others as sentencing enhancers.").  We have said that in cases where the effect of a sentencing factor on the ultimate sentence may have been extreme, the standard that due process requires would be clear and convincing evidence.[2]  United States v. Matthews, 29 F.3d 462, 464 (8th Cir. 1994) (concluding, without deciding whether a heightened standard of proof applies, that the district court's use of the clear and convincing evidence standard was sufficient).

Garth argues that her sentencing range should have been 1-7 months based on the facts of conviction and her criminal history, which is well-below the 57-months sentence she received.  The sentencing range was increased as a result of the district court's findings, which she argues had a "disproportionate effect on [her] sentence." But those findings were all based on the conspiracies for which Garth was tried and convicted.  Due process does not require a heightened standard of proof of facts that enhance a sentence when they relate to a conspiracy for which the defendant was charged.  United States v. Behler, 14 F.3d 1264, 1272 (8th Cir. 1994); United States v. Thompson, 51 F.3d 122, 125 (8th Cir. 1995); United States v. Pugh, 25 F.3d 669,

---

[2]The Third and Seventh Circuits have held that by rendering the Guidelines advisory, the Court has remedied any due process violation that occurs when sentencing facts found by a preponderance of the evidence are used to calculate an advisory Guidelines' range that causes an extreme increase in the length of the defendant's sentence.  United States v. Fisher, 502 F.3d 293, 308 (3d Cir. 2007) ("In sum, because the Guidelines are now advisory and district judges are empowered to discharge their duties fully in the first instance, it is a logical impossibility for the 'tail to wag the dog,' as could occur when the Guidelines were mandatory."), cert. denied 128 S. Ct. 1689; United States v. Reuter, 463 F.3d 792, 793 (7th Cir. 2006), cert. denied, 127 S. Ct. 1163 (2008).  We appear to have summarily dismissed the argument that the tail can no longer wag the dog now that the Guidelines are advisory. United States v. Archuleta, 412 F.3d 1003, 1007 (8th Cir. 2005) ("Nothing in Booker changes the interpretation of McMillan in our post- Apprendi cases.").  The Ninth Circuit agrees with our post-Booker conclusion and continues to apply a several factor test to determine whether sentencing facts had an "extremely disproportionate" effect on a sentence.  United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006).

676 (8th Cir. 1994); accord United States v. Garro, 517 F.3d 1163, 1169 (9th Cir. 2008) (holding that heightened evidentiary standard of proof is not required where the sentencing enhancement is "based entirely on the extent of the conspiracy to which [the defendant] pled guilty."). The district court's findings in this case—the amount of false claims made and the number of participants—all stem from the underlying conspiracy convictions. Consequently, due process does not require a heightened standard of proof.

B.

Next, we consider whether the findings by the district court were supported by a preponderance of the evidence. "We review a district court's findings of fact at sentencing for clear error, giving due deference to the court's opportunity to observe witnesses' credibility. . . ." United States v. Russell, 234 F.3d 404, 408 (8th Cir. 2000). The district court did not clearly err by concluding that Garth was responsible for $88,964 in false claims filed in 2001. In each instance, the return was filed using her password and computer at the East Lake Street Jackson Hewitt, and three 2001 filers affirmatively identified Garth as the preparer of their return. Each return was manipulated in order to claim excess refunds. The manipulation is obvious when the tax return is compared to the filer's actual wage and tax amounts withheld, which were proven by introduction of the filers' accurate W-2 form from Jackson Hewitt's files or from the IRS. Evans testified that Garth demanded a share of her refund when she returned to the store to retrieve it, and that Garth threatened her when she refused.

With regard to the 2002 tax year, the district court did not clearly err by concluding that Garth contributed to $29,345 in false claims against the federal government. She prepared David Thomas's 2002 return claiming $4,694, even though he died in 2001 and, consequently, earned no income in 2002. Garth's culpability for Thomas's return was obvious in light of the fact that she was not only the preparer, but that his return and Garth's return both listed an identical dependent,

a person named Yvonne Coleman. Virginia Taylor testified against Garth and admitted that she falsely claimed a refund of $6,259 for 2002 based on an agreement with Garth to split that amount with her. Cynthia Thomas, who died prior to trial, made $4,310 in false claims against the government in 2002, based on a false W-2 supplied by Garth and her daughter Latrina Caldwell. This finding was supported by the introduction of a taped interview between Thomas and investigators that was admitted at sentencing. Thomas's son Dashawn also made a $3,417 false claim using a false W-2 in 2002 and can be connected to Garth through his mother and by the fact that his false W-2 was from Comtec, Garth and Caldwell's 2001 employer. Comtec connects Latrina Caldwell's false claim amount of $2,365 to Garth, as does the mother-daughter relationship between the two women. Anita Turner filed a false claim amount of $4,715 using a false W-2 from Industrial Staffing. She can be connected to Garth by the fact that Garth's son, Donte Caldwell, referred to her as his aunt, she lived near filer Terome Realford's brother Carl Sanders, and she filed one of the $9,627 false Footlocker W-2s for 2003, which have been linked to Garth by their distinct similarity to one another. Finally, Erick West filed a false claim in 2002 for $3,585 using a false W-2 from the Minnesota Department of Economic Security, where West did not work. West can be connected to Garth by the fact that Garth prepared West false 2001 tax return, which greatly exaggerated West's wages from Wal-Mart.

Many of the false W-2s used to file 2003 tax returns were alike and, when grouped together, evidence a common plan or scheme. For instance, nine distinct W-2s falsely reported the same wages, $ 9,627, from employer Footlocker with the same incorrect employer identification number. One of the $9,627 Footlocker W-2s was connected to Garth by the trial testimony of Natasha Davis that she received the W-2 from Garth. Another of the $9,627 Footlocker W-2s is connected to Garth by the trial testimony of Agent Jeremy Martin, who testified that Terome Realford told investigators that he got his false Footlocker W-2 from Garth. The remaining seven can be connected to Garth by their similarity to the other two.

Similarly, a group of eight forged City of Minneapolis W-2s also falsely reported $9,627 in wages. They can be connected to Garth both by their similarity to the Footlocker W-2s and by testimony. Agent Jeremy Martin testified that Antonne Walker told him that Garth supplied him with one of the $9,627 City W-2s. Carl Sanders, who used one of the same W-2s, can be connected to Garth by the fact that he is co-conspirator Terome Realford's brother. Shantey Williams used one of the $9,627 City W-2s and testified that she received the W-2 from a woman called "Von."

Eleven more false 2003 claims were made using forged City of Minneapolis W-2s, although they, for the most part, had different wage amounts. Some can be connected to Garth by testimony. Camille Echols used one of these W-2s in the amount of $13,000 and Shantey Williams, who identified Garth, testified that she knew Echols was involved in the scheme too. Jelahn Prentiss was not mentioned at trial, but she used a false City W-2 with the same amount as Echols, $13,000. Kimberly Pearson used a false City W-2 and testified that it came from "Yvonne."[3] Natasha Davis, who used a false Footlocker W-2, testified that Jessica Gregory, who filed a false claim using a City W-2, was also involved in the illegal scheme. Cynthia Thomas used a false City W-2 that she claimed in pre-trial statements to investigators that she got from Garth. The remaining City W-2s can be connected to Garth by the fact that they purported to be from the City of Minneapolis, like so many other W-2s in this case, and they were forged.

Neither was it clear error for the district court to conclude that Garth was responsible for Donte Caldwell's false claim in the amount of $4,143 because Caldwell was Garth's son, and there was testimony that he helped his mother collect on debts from other tax files. Moreover, there was testimony that connected Terome Realford, another filer, to Caldwell. Caldwell also listed Terome Realford's son as

_____

[3]The jury acquitted Garth of aiding and abetting Pearson, but since the standard of proof for sentencing is lower than the standard for conviction, the district court did not clearly err by concluding that Garth was responsible for Pearson's false claim.

-12-

a dependent on Caldwell's federal return and listed Garth as providing childcare services to that child. In total, $95,941 was attributed to Garth for the tax year 2003 based on Caldwell's false W-2, the false City of Minneapolis W-2s, and the false Footlocker W-2s. When this amount is added to the false claims made in 2001 ($88,964) and 2002 ($29,345), then Garth's total responsibility was $214,250. The district court did not clearly err in concluding that this amount was supported by a preponderance of the evidence.

Finally, we conclude that the district court did not clearly err when it found that Garth was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1.

> When evaluating a defendant's role in the offense, the court considers several factors, including: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

United States v. Blumberg, 961 F.2d 787, 790-91 (8th Cir. 1992) (internal emphasis omitted) (quoting USSG § 3B1.1 n.3). The criminal activity (whether we refer to it as a large conspiracy or several small conspiracies operating around Garth) was extensive in this case, involving over sixty people. Garth was the linchpin of the conspiracy, providing the means by which every claim was filed against the government. There was evidence that she recruited others into the scheme and that she took as much as half of the false claim amount secured by each tax filer. Consequently, the district court properly concluded she was a leader and the activity involved more than five participants.

-13-

C.

Garth also seems to argue that the government's proof of tax loss failed because it used tax tables summarizing the amount of tax loss by year and by tax filer. The case she cites to support her argument, United States v. Wainright, 351 F.3d 816 (8th Cir. 2003), is one where the allegedly improper summary charts were used at trial. Id. at 820. Her complaint is with regard to sentencing, where the only rule of evidence is that the information have "sufficient indicia of reliability to supports its probable accuracy." United States v. Fleck, 413 F.3d 883, 894 (8th Cir. 2005) (internal quotation marks and brackets omitted). Garth claims that the charts contain assumptions and conclusions not based on witness testimony. The charts are based partly on witness testimony, but they were mostly compiled from the tax documents admitted at trial and sentencing. Garth points out no discrepancies among the summary charts and the tax documents or the witness testimony. Absent some allegation that the summaries misstated the evidence on which they were based, the district court committed no error by admitting them.

II.

Garth argues that there was a variance between the proof at trial and the allegations in the indictment. She, not unreasonably, interprets the indictment to aver the existence of two single, overarching conspiracies: the "2001 conspiracy," wherein, as a tax preparer, she provided false tax returns to co-conspirators in order that they might file false claims against the government, and the "2003 conspiracy," wherein she provided false W-2 forms to co-conspirators for the same purpose. She argues, however, that there was insufficient proof connecting her alleged co-conspirators to one another. In other words, she avers that even if the tax filers entered into an illegal agreement with Garth (thereby establishing multiple conspiracies), they did not enter into an illegal agreement with one another (to establish two single conspiracies).

-14-

Even if we assume that Garth has correctly identified a variance, only a material variance justifies reversal. Berger v. United States, 295 U.S. 78, 81-82 (1935). Since Garth raised this argument below, we will not reverse if the error was harmless and the error would be harmless if it does not affect the defendant's substantial rights. Fed. R. Crim. P. 52(a); United States v. Barth, 424 F.3d 752, 759 (8th Cir. 2005). A variance infringes a defendant's substantial rights when one of three forms of prejudice are established. We may dismiss two of the three types of prejudice without analysis because neither was averred in this case. Thus, even though prejudice exists when the indictment itself causes insufficient notice of what evidence would be provided against the defendant at trial or when it was so vague as to risk subsequent prosecution for the same conduct, see Berger, 295 U.S. at 82; United States v. Smith, 450 F.3d 856, 860 n.1 (8th Cir. 2006), those forms of prejudice are not present here.

Garth does aver prejudice of the third type, which is the type most commonly associated with a multiple conspiracy variance: that the defendant was prejudiced by "the spillover of evidence, that is to say the jury's inference of guilt [was] based on evidence not related to that defendant's conspiracy." Barth, 424 F.3d at 759; Smith, 450 F.3d at 860 n.1; see Kotteakos v. United States, 328 U.S. 750, 774 (1946). In Kotteakos, the Court reversed the appellant's conviction on account of a variance by proof of multiple conspiracies because of "[t]he dangers for transference of guilt from one to another across the line separating conspiracies" where the appellants were not members of the multiple putative conspiracies. 328 U.S. at 774. But the danger of spillover evidence "is minimal, if not non-existent" where the appellant is involved in all of the multiple putative conspiracies. United States v. Scott, 511 F.2d 15, 20 (8th Cir. 1975); accord United States v. Ghant, 339 F.3d 660, 664 (8th Cir. 2003) ("[The defendant] has cited no case in which, despite evidence that the defendant participated in all of the conspiracies, a variance between the number of conspiracies charged and the number proven was found to have prejudiced the defendant."); see United States v. Nicholson, 231 F.3d 445, 452 (8th Cir. 2000) (substantial evidence

put defendant complaining of variance in "the thick of things" and, thus, defendant did not suffer "'unwarranted imputation of guilt from others' conduct'"). Garth identifies no evidence that might have led the jury to convict her on account of criminal activity for which she was not allegedly involved. And our review of the record reveals no such evidence. Consequently, she "faced little or no risk of prejudice from spillover evidence because [s]he was involved in all stages and aspects of the crimes committed. Regardless of how many conspiracies the government alleged were committed, it presented evidence that [Garth] was involved in all of them." Barth, 424 F.3d at 759-60 (8th Cir. 2008).

Garth does argue, however, that she was prejudiced at sentencing on account of the variance because the sentencing court held her accountable for the false claims of every tax filer even though the government did not prove that each tax filer was a member of the single conspiracies. Essentially, this is another variation on the argument we dismissed in Part I, whether Garth has a right to have sentencing facts proven to the jury. Since the right to trial by jury is not violated when a district court finds sentencing facts that do not increase the maximum punishment for the crime of conviction, and Garth was not exposed to such an increase, she cannot show prejudice on account of the variance. United States v. Marston, 517 F.3d 996, 1006 (8th Cir. 2008) (increase on account of facts found by district court that was within statutory maximum did not violate Sixth Amendment). The district court was well within its authority to consider Garth's involvement in each false claim in deciding upon her sentence.

III.

Garth also makes several challenges to the evidence. She argues her rights under the Confrontation Clause were violated when the district court admitted tax returns of non-testifying witnesses. We review de novo alleged violations of the Confrontation Clause. United States v. Heppner, 519 F.3d 744, 751 (8th Cir. 2008), cert. filed, 08-5334 (U.S. July 12, 2008). The Confrontation Clause applies only to testimonial statements, such as prior testimony at a preliminary hearing, former trial, or before a grand jury and statements made in the course of police interrogations. Crawford v. Washington, 541 U.S. 36, 68 (2004). "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Court observed, "Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." Id. at 56; see also id. at 76 (Rehnquist, C.J., concurring in the judgment) ("[T]he Court's analysis of 'testimony' excludes at least some hearsay exceptions, such as business records and official records."). Garth stipulated at trial that the tax returns were business records to avoid the "need to bring in a business records witness[]." She makes no attempt, in her brief, to argue that the tax returns were testimonial. And, in fact, the returns were not prepared for litigation, as is expected of testimonial evidence. See United States v. Torres-Villalobos, 487 F.3d 607, 613 (8th Cir. 2007) (holding that warrants of deportation were "properly characterized as non-testimonial official records that were prepared independent of this litigation" and were not prepared "to prove facts for use in future criminal prosecutions.") Consequently, the admission of tax returns did not violate Garth's right to confront her accusers.

The remaining evidentiary challenges we review for abuse of discretion. United States v. Durham, 470 F.3d 727, 731 (8th Cir. 2006). Garth argues that the tax documents were inadmissible hearsay. By stipulating that the records were business

-17-

records, Garth has necessarily forfeited this argument because business records are admissible under the hearsay exception. Fed. R. Evid. 803(6).

She also argues that investigator Jeremy Martin gave improper opinion testimony that all the "Yvonne Caldwell" signatures on the 2001 paper tax returns stored by Jackson Hewitt appeared to be in similar handwriting. Martin was not established as an expert. However, lay witnesses may make "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Martin was not making a specialized, scientific, or technical handwriting analysis. He was only asked whether the many signatures of the same name appeared similar. Moreover, each document was admitted into evidence and displayed for the jury to consider in conjunction with Martin's lay testimony. Consequently, his analysis was rational, helpful, and not based on expert knowledge; the district court did not abuse its discretion by admitting the testimony.

Finally, Garth makes an incomplete argument that evidence proving that non-testifying witnesses filed false returns was inadmissible character evidence, Fed. R. Evid. 404(b), and was unfairly prejudicial, Fed. R. Evid. 403. We conclude that neither argument has merit because each piece of evidence was relevant to the two conspiracies and the relevance outweighed any unfair prejudice to the defendant.

IV.

Garth's conviction and sentence are AFFIRMED.

_____